**STATE OF WEST VIRGINIA, Plaintiff,**

v.

**CHAS. PFIZER & CO., Inc., American Cyanamid Company, Bristol-Myers Company, Olin Mathieson Chemical Corporation, and The Upjohn Company, Defendants.**

**No. 68 Civ. 240.**
**and other antibiotic drug antitrust actions.**

United States District Court,
S. D. New York.

June 24, 1970.

As Amended Sept. 18, 1970.

Dickstein, Shapiro & Galligan, New York City, for plaintiffs States of Alabama, Florida, Georgia, Iowa, Kentucky, Louisiana, Maine, Massachusetts, Minnesota, Mississippi, Missouri, North Dakota, Ohio, Oklahoma, Rhode Island, South Dakota, Texas, Vermont, Virginia and Wisconsin; Cities of New York (counterclaim plaintiff) and Memphis; District of Columbia.

G. Kent Edwards, Atty. Gen., Juneau, Alaska, for plaintiff State of Alaska.

Harrison, Strick & Myers, Phoenix, Ariz., for plaintiffs State of Arizona and County of Maricopa.

Joe Purcell, Atty. Gen., Jerry D. Pinson, Asst. Atty. Gen., Little Rock, Ark., for plaintiff State of Arkansas.

Perry Goldberg, Friedman, Koven, Shapiro, Salzman, Koenigsberg, Specks & Homer, Chicago, Ill., for plaintiffs States of Connecticut, Idaho, Maryland, New Jersey, New Mexico, and Wyoming; City and County of Denver; Mayor and City Council of Baltimore.

Lee A. Freeman, Chicago, Ill., for plaintiffs States of Colorado, Illinois, Indiana, Michigan, New Hampshire, Pennsylvania, West Virginia; City of Chicago; Metropolitan Government of Nashville and Davidson County.

Robert L. Woodahl, Atty. Gen., James R. Anderson, Douglas J. Wold, Asst. Attys. Gen., Helena, Mont., for plaintiff State of Montana.

Clarence A. H. Meyer, Atty. Gen., Lincoln, Neb., for plaintiff State of Nebraska.

Louis J. Lefkowitz, Atty. Gen., Albany, N. Y., George C. Mantzoros, Asst. Atty. Gen., New York City, for plaintiff State of New York.

Robert E. Sher, Washington, D. C., for plaintiff Commonwealth of Puerto Rico.

Daniel R. McLeod, Atty. Gen., John Bowen, Asst. Atty. Gen., Columbia, S. C., for plaintiff State of South Carolina.

George F. McCanless, Atty. Gen., C. Hayes Cooney, Elmer D. Davies, Asst. Attys. Gen., Nashville, Tenn., for plaintiff State of Tennessee.

Dilworth, Paxson, Kalish, Kohn & Levy, Cohen, Shapiro, Berger, Polisher & Cohen, Philadelphia, Pa., for plaintiffs City of Philadelphia, City of Detroit et al., and Sun Ray Drug Co., et al.

Leo Schwartz, Boston, Mass., for plaintiffs City of Boston, Richardson Drug Co., Inc., et al.

Schein, Askounis, Stavins & Wald, Chicago, Ill., for plaintiffs Alpine Pharmacy, Inc., et al.

Peck, Shaffer & Williams, Cincinnati, Ohio, for plaintiffs Herbert Beins, d/b/a Waverly Drugs, et al.

Schwartz & Alschuler, Beverly Hills, Cal., for plaintiff Domaro, Inc. and counterclaim plaintiff Benalen Corporation.

Edward A. Berman, Lawrence Walner, Chicago, Ill., for plaintiffs Cotler Drugs, Inc., et al.

James P. Chapman, James B. Sloan, Chicago, Ill., for plaintiffs DeKoven Drug Co., Inc., et al.

Donald B. Brown, Los Angeles, Cal., for plaintiffs Mario De Modena, d/b/a The Apothecary Shop, et al.

Levy & Erens, Chicago, Ill., for plaintiffs Ford Hopkins Co., et al.

Sager, Silverman, Bodne & Burns, Miami, Fla., for plaintiff Lee's Prescription Shops, Inc.

Dene T. Lusby, Baltimore, Md., for plaintiff Rockdale Pharmacy, Inc., et al.

Cochrane & Bresnahan, St. Paul, Minn., for plaintiffs Peterson's Pharmacy, Inc., et al.

Antonio M. Bird, Old San Juan, P. R., for plaintiffs Weiwall Drug Corporation et al.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant Chas. Pfizer & Co., Inc.

Donovan Leisure Newton & Irvine, New York City, for defendant American Cyanamid Co.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant Bristol-Myers Co.

Cravath, Swaine & Moore, New York City, for defendants Olin Mathieson Chemical Corporation and Squibb Beech-Nut, Inc.

Covington & Burling, Washington, D. C., for defendant The Upjohn Co.

WYATT, District Judge.

This is an application by defendants and by plaintiffs in these class actions for approval of a proposed compromise under which the actions and all claims of the classes therein will be settled and dismissed with prejudice. Fed.R.Civ.P. 23 (e) The application is granted and the proposed compromise is approved.

These are 66 civil actions, 26 of which were commenced in this District and 40 of which were transferred to this District by the Judicial Panel on Multidistrict Litigation (the Panel) "for coordinated or consolidated pretrial proceedings" (28 U.S.C. § 1407; see 295 F.Supp. 1402, 297 F.Supp. 1126, 299 F.Supp. 1403, 301 F.Supp. 1158, 303 F.Supp. 1056, 309 F.Supp. 155). The 66 civil actions which are the subject of the present application are sometimes referred to in this opinion as simply "these actions".

The same five companies are defendants in each of these actions (Squibb Beech-Nut, Inc. is also a defendant in some actions); they may be referred to as Pfizer, Cyanamid, Bristol, Squibb (a

division of defendant Olin Mathieson Chemical Corporation until about January 1, 1966 and ultimately a part of Squibb Beech-Nut, Inc.), and Upjohn. They have been for some years sellers of broad spectrum antibiotic drugs, the most important of which is tetracycline and on which a patent, owned by Pfizer and often called "the Conover patent", issued on January 11, 1955. Pfizer, Cyanamid and Bristol made tetracycline and sold it in dosage form. Bristol sold tetracycline in bulk to Squibb and Upjohn which sold it in dosage form.

Antibiotic drugs are prescription drugs used for infectious diseases. Broad spectrum antibiotic drugs, such as tetracycline, are effective against a wider range of germs than are the narrow spectrum antibiotic drugs, such as penicillin. The word "antibiotics" when used in this opinion refers to broad spectrum antibiotic drugs.

There are in total before this Court some 150 similar civil actions against the same defendants, either commenced in this District or transferred here by the Panel. These some 150 actions are divided into the following groups: (a) the 66 actions which are the subject of the present application; (b) some actions in which plaintiffs were offered but rejected the same proposed settlement on which the present application is based; (c) some actions in which plaintiffs have not been offered any settlement by defendants; and (d) about 26 actions in which plaintiffs are private hospitals to which a separate offer of settlement has been made by defendants.

The claim in each of the actions is that defendants violated the antitrust laws in the sale of antibiotics, specifically Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2); treble damages are sought, as authorized in 15 U.S.C. § 15.

## A. DEVELOPMENT OF BROAD SPECTRUM ANTIBIOTICS

Data as to the four principal broad spectrum antibiotics are as follows:

| Generic Name | Trade Name | First Introduced | By Whom |
| --- | --- | --- | --- |
| chlortetracycline | Aureomycin | December 1948 | Cyanamid |
| chloramphenicol | Chloromycetin | January 1949 | Parke, Davis |
| oxytetracycline | Terramycin | March 1950 | Pfizer |
| tetracycline | Achromycin | November 1953 | Cyanamid |
| | Tetracyn | January 1954 | Pfizer |
| | Polycycline | April 1954 | Bristol |
| | Steclin | September 1954 | Squibb |
| | Panmycin | October 1954 | Upjohn |

Cyanamid owns the patent for chlortetracycline (the Duggar patent) issued September 1949, and an improvement patent (Niedercorn) issued September 1952.

Pfizer owns the patent for oxytetracycline (the Sobin patent) issued July 1950.

When the Duggar and Sobin patents issued, the chemical structure of the antibiotics produced—trade names, Aureomycin and Terramycin—were not known.

In 1952, a Pfizer research team made the first discovery of the chemical structure of Aureomycin and Terramycin. On June 17, 1952, Conover, a member of the Pfizer team, discovered tetracycline by removing the chlorine atom from Aureomycin.

Tetracycline proved to be highly superior to the earlier antibiotics.

The discovery of tetracycline was announced to the world in an article on

August 8, 1952 in the Journal of the American Chemical Society. On October 23, 1952, application for the Conover patent was filed. Thereafter, applications for tetracycline patents were filed by Cyanamid and by Bristol, among others.

It eventually developed that to produce tetracycline, it was necessary to use the Duggar and Niedercorn patents for the fermentation process. If a patent on the Conover invention were issued to Pfizer, then neither Cyanamid nor Pfizer could make tetracycline except by agreement between them. Each would be blocked by a patent of the other.

After meetings on November 7 and 15, 1953 between McKeen (Pfizer) and Malcolm (Cyanamid) an agreement was made by which Cyanamid would license Pfizer under the Duggar and Niedercorn patents; in addition, it was agreed that proofs of priority on tetracycline would be exchanged; that the party found (on such exchange of proofs) not to have priority would then concede priority to the other; and that the party receiving the patent on tetracycline would then license the other.

Bristol began making and selling tetracycline in May 1954. It sold the drug in bulk to Squibb and to Upjohn, who in turn sold in dosage form under their respective trade names. Bristol also sold in dosage form under its trade name.

Cyanamid brought an action against Bristol in September 1954, asserting that in making tetracycline Bristol infringed the Duggar and Niedercorn patents. This action was settled in December 1954 and Bristol received a license (with royalty to Cyanamid) for use of the Duggar and Niedercorn processes in making tetracycline.

After an exchange of evidence as to priority, Cyanamid conceded in February 1954 that Conover was prior in discovery of tetracycline.

The Conover patent issued on January 11, 1955 and has since been owned by Pfizer.

On the same day the patent issued, Pfizer commenced an action against Bristol, Squibb and Upjohn in the Northern District of Georgia. The charge was infringement of the Conover patent for tetracycline.

Bristol, Squibb and Upjohn then sued Pfizer in this Court for a declaratory judgment on the Conover patent and, over strong opposition from Pfizer, obtained transfer of Pfizer's action from the Northern District of Georgia to this Court (131 F.Supp. 21, 225 F.2d 718, 225 F.2d 720).

The litigation between Pfizer on the one hand and Bristol, Squibb and Upjohn on the other was settled on December 15, 1955. To a considerable extent this was due to the efforts made by Schwartz, president of Bristol. Licenses under the Conover patent for tetracycline were granted by Pfizer to Bristol, Squibb and Upjohn (with royalty to Pfizer).

## B. THE CLAIMS IN THESE ACTIONS ARE BASED ON CHARGES BY THE FEDERAL TRADE COMMISSION AND IN AN INDICTMENT

It is without dispute that the claims in the complaints are substantially the same as charges made against the defendants by the Federal Trade Commission (the Commission) and in an indictment against three of the defendants handed up by a grand jury in this District on August 17, 1961. A review of these proceedings, and of an investigation by a Senate Subcommittee, will be useful as background.

## C. PROCEEDINGS BY THE COMMISSION AND BY A SENATE SUBCOMMITTEE

1. Investigations by the Commission

In 1951, the Commission began an investigation of the pricing policies of Pfizer in selling "Terramycin", its trade name for an early broad spectrum antibiotic. Pfizer furnished extensive data. This lasted until 1955.

By resolution on July 22, 1953 (amended on July 13, 1956), the Commission initiated an investigation (15 U.S.C. §§ 46, 49) of "the * * * business, conduct, practices and management of corporations engaged in the production, sale or distribution of antibiotic drugs * * * ". This investigation went on until 1958. The defendants and others responded to extensive data requests of the Commission. On the basis of these responses and other material and records, the Commission in June 1958 issued an "Economic Report on Antibiotics Manufacture"; this Report was of some 360 pages.

### 2. Investigation by a Senate Subcommittee

In 1959 and 1960, the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary investigated the ethical drug industry, which included the defendants here. Senator Kefauver was Chairman of the Subcommittee and Paul Rand Dixon was its Counsel and Staff Director. At the request of the Subcommittee, defendants furnished documentary material and other information. For six days in September 1960 there were public hearings before the Subcommittee, principally about antibiotics and about many of the matters involved in these actions. A report of the Subcommittee entitled "A Study of Administered Prices in the Drug Industry" (S.Rep. No. 448, 87th Cong., 1st Sess. 1961) was transmitted to the full Committee on May 8, 1961.

### 3. The Complaint of the Commission; Taking of Evidence

On July 28, 1958, the Commission issued a complaint charging the defendants with unfair methods of competition and unfair acts and practices in the sale of antibiotics, all in violation of Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45).

The charges made by the Commission in summary were these:

a. that Pfizer secured issuance of the Conover patent by fraud on the Patent Office and, aside from such fraud, secured issuance of the patent despite the fact that the invention was obvious and in public use before the Conover application was filed;

b. that by conspiracy all five defendants secured issuance to Pfizer of the Conover patent; that Pfizer made false representations to the Patent Office; that Pfizer, Bristol and Cyanamid withheld material information from the Patent Office; and that the other four defendants obtained licenses from Pfizer with knowledge of the fraud on the Patent Office and with knowledge that the invention was not patentable; and

c. that by conspiracy all five defendants fixed prices and, by keeping out competitors, monopolized antibiotics.

The defendants by October 15, 1958 had served their answers, denying the charges in the Commission's complaint.

Evidence was taken before Robert L. Piper, a Hearing Examiner, between January 1959 and February 1960. There was testimony by witnesses, apparently all in New York, on 86 days. The Commission called 13 witnesses; the defendants called 45 witnesses; and 3 witnesses (accountants) were considered as called by the Hearing Examiner. The testimony appears to have run to some 9,000 pages in the stenographic transcript. The documentary exhibits were massive in number and extent; they occupy at least 12 printed volumes and consist of some 8,000 pages.

The witnesses before the Hearing Examiner included the chief executives of each of the defendants: Malcolm of Cyanamid, McKeen of Pfizer, Schwartz of Bristol, Toohy of Squibb, and Gilmore of Upjohn. They each denied categorically that they were parties to any conspiracy or any other sort of price fixing agreement.

### 4. Initial Decision of Hearing Examiner

The Hearing Examiner filed an Initial Decision on October 3, 1961. This is a detailed document of about 270 printed pages. The Decision was completely in favor of defendants, exonerating them from any violation of the Federal Trade Commission Act and ordering that the complaint be dismissed.

### 5. Decision of Commission

The matter was then taken to the full Commission.

Meanwhile, in March 1961, Paul Rand Dixon had been named Chairman of the Commission; as already mentioned, he had been Counsel and Staff Director to the Senate Subcommittee which investigated the drug industry, including these five defendants, and made a report thereon.

The defendants moved that Chairman Dixon be disqualified. The Commission on December 20, 1961 denied the motion on the ground that disqualification was "for determination by the individual member concerned". Chairman Dixon declined to withdraw from participation in the proceeding.

The Commission (Dixon, Anderson, Elman, MacIntyre, Higginbotham) on August 8, 1963 filed its opinion, findings of fact and conclusions of law written by The Honorable A. Leon Higginbotham, Jr., then a Commissioner and now a United States District Judge for the Eastern District of Pennsylvania. The Commission issued orders on August 8 and December 17, 1963.

The opinion of the Commission disagrees in large part with that of the Hearing Examiner.

The Commission decision may be summarized as follows:

a. Pfizer by misrepresentations to and withholding information from the Patent Office prevented an accurate decision on the issuance of a patent on tetracycline on the Conover application;

b. the conduct of Cyanamid before the Patent Office was the same as that of Pfizer;

c. that it was not proven that a conspiracy existed between Pfizer and Cyanamid before the Patent Office, or any conspiracy among the five defendants to exclude others;

d. there was no misconduct before the Patent Office by Bristol, Squibb or Upjohn; and

e. the five defendants conspired to fix prices for tetracycline.

The final order of the Commission was that the five defendants cease and desist from any and all forms of price fixing agreements, that they each take specific steps in respect of independent pricing activities, that Pfizer grant to any applicant a license under the Conover patent for a royalty of not more than $2\frac{1}{2}\%$ of net sales, and that Cyanamid grant to any applicant a license under the Duggar and Niedercorn patents for a royalty of not more than $2\frac{1}{2}\%$ of net sales. See Note: Improperly Procured Patents: FTC Jurisdiction and Remedial Power, 77 Harv.L.Rev. 1505 (1964).

### 6. Decision of the Court of Appeals (363 F.2d 757)

The defendants obtained a review of the Commission's order by the Court of Appeals for the Sixth Circuit (15 U.S.C. § 45(c)).

The decision of the Court was handed down on June 16, 1966.

The Court first decided that the active part played by Chairman Dixon while counsel to the Senate Subcommittee caused him to form opinions as to facts which later became "inseparably a part of the ultimate findings of fact of the Commission" (363 F.2d at 765). The Court concluded that the participation of Chairman Dixon in the decision of the Commission was a denial of due process to the defendants, requiring that the decision be set aside and the matter remanded for a fresh consideration by

the Commission without any participation by Chairman Dixon.

The Court expressed no opinion whether there was substantial evidence to support the findings of the Commission that there was price fixing by defendants.

As to the issue of misconduct before the Patent Office, the Court expressed its opinion at some length.

The Court found that the fundamental question was whether coproduction (or inherent production) of tetracycline in the fermentation *broths* from which chlortetracycline (Aureomycin) had been recovered was material to the issuance of the Conover patent. There is a distinction between coproduction of tetracycline in the *broths* and the presence of tetracycline in the resultant *product* (Aureomycin). In this connection, the Court believed that there were many questions as to the actions and purposes of Patent Examiner Lidoff, who allowed the Conover patent, and was surprised that Lidoff, because of Patent Office policy and practice, had not been called as a witness. The Court saw no reason why Lidoff should not be required to testify and the Court framed about 12 specific questions for him. The Court found that, absent any testimony from Lidoff, the order of the Commission on the Patent Office misconduct issue was not supported by substantial evidence.

### 7. Initial Decision on Remand

On remand, it appeared that Mr. Piper was no longer employed by the Commission. The matter was referred to Abner J. Lipscomb, as Hearing Examiner, for taking the testimony of Lidoff and of any witnesses who had already testified on the issue of misconduct before the Patent Office.

There were hearings before Mr. Lipscomb in Washington on September 12 and 13, 1966. Lidoff was called for the Commission and testified; Hutz, a patent attorney for Pfizer, and Murphy, who did patent work for Pfizer, were called for Pfizer and testified.

The testimony of Lidoff in summary was that on November 24, 1954 he rejected the Conover product claims because he believed it probable that tetracycline had been produced along with chlortetracycline (Aureomycin) in the *broths* of the Duggar and Niedercorn processes; that thereafter he accepted the statements of tests by Pfizer that no identifiable tetracycline was produced in the Duggar-Niedercorn process; that had he known there was in fact such coproduction, the Conover patent would not have issued; that he was interested in whether there was coproduction in the *broths,* not whether tetracycline was present in the product Aureomycin; that he did not know tetracycline was present in the product Aureomycin; that had he known this, he would have rejected the Conover application on this ground, a different ground and one which related to prior public use rather than to disclosure in published patents (the basis on which he was interested in the Duggar-Niedercorn broth production).

The assignment to Hearing Examiner Lipscomb was solely for decision whether Pfizer and Cyanamid made misrepresentations, etc. to the Patent Office and thus caused Lidoff to allow a patent which otherwise would not have been allowed. Hearing Examiner Lipscomb accepted the testimony of Lidoff and adding this to the evidence already in the record found substantial evidence that there was misconduct by Pfizer and Cyanamid before the Patent Office as a result of which the Conover patent issued. The initial decision of the Hearing Examiner on remand was made on November 9, 1966.

### 8. Decision of the Commission on Remand

The matter then went to the Commission. Chairman Dixon did not participate. Since the time of the first decision, Commissioners Anderson and Higginbotham had been replaced by Commissioners Reilly and Jones. The four

Commissioners who decided the matter on remand were thus Elman, MacIntyre, Reilly and Jones.

The Commission on September 29, 1967 filed its opinion and on the same day issued its order.

As to the patent issue, the Commission found that the testimony of Lidoff supported the earlier findings and opinion of the Commission rather than those of the first Hearing Examiner, Mr. Piper. It was concluded that Pfizer and Cyanamid in substance were guilty of fraud on the Patent Office, as a result of which the Conover patent issued.

As to the price fixing issue, the four Commissioners were evenly divided. On the basis of new firms entering the field and of a decline in prices, Commissioners Elman and Reilly believed it was not necessary to decide the price fixing issue, which (in simple terms) was whether the earlier uniform prices were the result of conspiracy among the five defendants. Commissioners MacIntyre and Jones believed that the earlier findings and order as to price fixing should be adhered to and issued. There being no majority of the Commission in support of findings and an order as to price fixing, the complaint so far as it charged price fixing was dismissed.

The final order of the Commission dealt only with misconduct of Pfizer and Cyanamid before the Patent Office and as to this the final order was the same as the earlier order. No part of the order was directed against Bristol, Squibb or Upjohn; as to them the complaint was dismissed completely.

### 9. Second Decision of the Court of Appeals (401 F.2d 574)

Pfizer and Cyanamid obtained a review of the Commission's order by the Court of Appeals for the Sixth Circuit (15 U.S.C. § 45(c)).

The decision of the Court was handed down on September 30, 1968.

It was found that Lidoff had answered the material questions framed in the Court's first opinion and that this testimony supported the original findings of the Commission and contradicted the findings of Hearing Examiner Piper. The misconduct of Pfizer and Cyanamid was shown by substantial evidence and justified the compulsory licensing order of the Commission. The Court declined to pass on the credibility of Lidoff, saying that it would not "second-guess the Hearing Examiner and the Commission" (401 F.2d at 584). The order of the Commission was affirmed.

It may be noted that the Court did not decide whether the views of Lidoff as to patent law were correct or not. Lidoff testified that had he known what Pfizer and Cyanamid knew as to co-production of tetracycline and as to its presence in Aureomycin, he would not have allowed the patent. As will be mentioned later, there may be some question whether this would be good patent law. Decisions such as Parke-Davis & Co. v. H. K. Mulford Co., 189 F. 95 (C.C. S.D.N.Y.1911), affirmed 196 F. 496 (2d Cir. 1912) raise difficult issues in this connection. The Court of Appeals for the Sixth Circuit stated that it "did not undertake to pass upon the validity of the [Conover] patent" (401 F.2d at 586).

### 10. Denial of Certiorari

The Supreme Court denied certiorari on March 24, 1969 (394 U.S. 920) and the Commission proceedings came to an end.

## D. THE CRIMINAL PROCEEDINGS TO DATE

### 1. The Indictment; its Dismissal as to Individual Defendants

A grand jury in this District returned an indictment (61 Cr. 772) on August 17, 1961 naming as defendants Pfizer, Cyanamid, Bristol, McKeen (of Pfizer), Malcolm (of Cyanamid) and Schwartz (of Bristol). Squibb and Upjohn were named as co-conspirators.

The indictment charged in three counts a conspiracy in restraint of trade, a conspiracy to monopolize trade, and a monopoly of trade, in broad spectrum

antibiotics. It was charged that Sections 1 and 2 of the Sherman Act had been violated.

The indictment covered the same ground as that covered by the complaint of the Commission. It was charged that defendants, pursuant to a conspiracy, misled the Patent Office, used patents to exclude competitors, and fixed prices. All defendants pleaded not guilty.

After the return of the indictment, a grand jury in January 1962 was empanelled in the District of Columbia and investigated the conduct of a government official in transactions with drug firms, including these defendants. Under subpoena, McKeen, Malcolm and Schwartz testified before this Grand Jury (which returned no indictment). On motion of these individual defendants and over the Government's opposition, Judge Ryan, by order with opinion filed September 9, 1965, dismissed the indictment as to them (245 F.Supp. 801). The reason was that by testifying before the grand jury in the District of Columbia the individual defendants became immune from prosecution on the indictment in this District (15 U.S.C. §§ 32, 33).

### 2. The Criminal Trial

Trial of the indictment took place between November 23 and December 29, 1967 before Judge Frankel and a jury.

Nearly all the testimony offered by the government came from employees or former employees of the three defendants and the two alleged co-conspirators. The government called six witnesses from Pfizer, four from Cyanamid, three from Bristol, four from Upjohn, and one from Squibb; in addition, the government read the testimony in the Commission proceedings of Malcolm of Cyanamid (ill at time of trial) and Niedercorn of Cyanamid (who had died). The government called six witnesses who had not been connected with any defendant or alleged co-conspirator; these included Patent Examiner Lidoff. Most of the documentary evidence offered by the government came from the defendants or from alleged co-conspirators.

The defendants put in their case through the cross-examination of the government witnesses, most of whom were their employees or former employees.

In its bill of particulars, the government had stated that McKeen, Malcolm and Schwartz were responsible for the "pricing policy" of their respective companies. McKeen and Schwartz were called by the government and testified at trial and (as already noted) testimony of Malcolm was read by the government to the jury. They each categorically denied doing any of the acts charged in the indictment.

It was developed at trial that Parke Davis & Co. was a maker of broad spectrum antibiotics, was second in volume of sales of such antibiotics, followed the same prices and practices as the defendants on trial, and was concededly not a member of any conspiracy.

After the government rested on December 8, 1967, one witness was recalled by Pfizer for relatively short testimony concerning exhibits dealing with financial matters. This was the comptroller of Pfizer and after his testimony all defendants rested.

The case was submitted to the jury at 3:45 p. m. on December 28, 1967. The jury suspended its deliberation at 10:15 p. m. that night and resumed at 9:30 a. m. the following morning.

During its deliberation, the jury asked for and was given a copy of the Court's charge, the charts used by the government in summation, the charts showing the share of Parke Davis in the broad spectrum antibiotics market, and the evidence referred to in the Court's charge as to the dosages, prices and market techniques of Parke Davis.

The jury returned a verdict of guilty on all three counts as to each defendant on December 29, 1967 at 9:45 p. m.

### 3. Reversal of the Convictions

The judgment of conviction was appealed. The appeal was argued on May 7, 1969. The record on appeal fills 21 printed volumes, covering some 12,500 pages.

On April 16, 1970—after the hearing before this Court on the issue of approval of the proposed compromise—the Court of Appeals handed down its decision, reversing the judgments of conviction and directing a new trial. 426 F.2d 32. Judge Moore wrote the opinion; Judge Friendly concurred; Judge Hays dissented.

The reversal was for errors in the charge of the Court; whether the evidence was sufficient to support the conviction was not decided nor were any questions of patent law decided.

The Court noted that "the government's case, insofar as actual proof is concerned, rests almost entirely upon oral and written statements from defendants themselves. * * * the facts may be said to be virtually undisputed".

The Court placed great stress on the denials of the officers of the three defendants that any agreements as charged in the indictment were made at their meetings; the Court also stressed that the documents agreed to at the meetings showed nothing illegal. The Court stated that because conviction thus depended on the drawing of inferences by the jury contrary to this evidence, "the importance of instructions cannot be overemphasized".

The errors in the Court's charge were in summary as follows:

a. proper attention was not given to the "key issue", namely, the specific conspiracy charged, but the jury was permitted to infer conspiracy from the course of conduct shown by all the evidence;

b. the testimony of McKeen, Malcolm and Schwartz as to their meetings was "vital to any jury decision as to the existence of a conspiracy" but the testimony was "slighted and rather deprecated" in the charge;

c. by failing to explain that the Patent Office proceedings were only relevant to a consideration whether Pfizer and Cyanamid had agreed to exclude others at their November 1953 meetings, the charge "virtually diverted" the indictment "from an antitrust conspiracy case to a patent fraud case";

d. the jury's attention was "diverted" to an "inflammatory" issue, namely, whether there were "unreasonably high prices" (it is not clear whether this issue was considered irrelevant or whether it was felt to have been overemphasized in the charge);

e. the jury was improperly limited in considering the "all-important" evidence as to Parke Davis; there was no explanation of the significance of the Parke Davis evidence; and defendants were improperly restricted in argument from such evidence;

f. an "incorrect" interpretation was made of the November 1955 Bristol-Squibb-Upjohn agreements; these had no such "limitation on Squibb and Upjohn which barred them from manufacturing" as the Court charged; and

g. there should have been, but were not, "the clearest instructions that the jury should not consider Bristol's part in any of the events prior to December 14–15, 1955 as proof of Bristol's being in any conspiracy".

While Judge Hays voted to affirm and found the evidence for the government "sufficient" in the "perspective" of a "limited scope of review" he did note that such evidence was "not overwhelming".

### E. COMMENCEMENT OF THE CIVIL ACTIONS

The first assertions of treble damage claims were by defendants filing counterclaims in patent infringement actions brought by Pfizer and Cyanamid.

The first infringement actions by Pfizer were against Bristol, Squibb, and Upjohn; these (to which reference has been made above) were brought on the

day the Conover patent issued and, as noted, were settled in December 1955.

Pfizer brought no other such actions until October 1960 but after that date and over the next five years Pfizer brought some 30 infringement actions on the Conover patent. A list of these actions is Appendix F to the first opinion of the Sixth Circuit (363 F.2d at 817).

One of these infringement actions was commenced by Pfizer on June 4, 1964 in this Court against the City of New York. On July 1, 1964, the City filed an answer containing a counterclaim against Pfizer and against Cyanamid, Bristol, Squibb and Upjohn as additional defendants. This counterclaim asserted a claim for treble damages for violation of the antitrust laws, based on the charges in the indictment. The counterclaim in substantial part is word for word copied from the indictment.

There may have been such a counterclaim earlier in infringement actions brought by Pfizer and by Cyanamid. The counterclaim by the City of New York on July 1, 1964 is the first of the similar claims in the actions now proposed to be settled.

In three patent infringement actions brought by Pfizer, treble damage antitrust counterclaims were filed by defendants respectively on September 30, 1965, on August 23, 1966 and on June 26, 1967. These referred to the Federal Trade Commission proceedings and to the indictment.

The first action commenced by a plaintiff asserting treble damage antitrust claims against defendants was that of the State of Texas commenced on August 4, 1967 in the Northern District of Texas. Counsel for Texas included some attorneys who were acting for the City of New York in the Pfizer infringement action; it was in this latter action that treble damage claims had been asserted on July 1, 1964 as a counterclaim. The complaint in the action by Texas asserted claims on behalf of a class consisting of the State and all cities and counties in the state which had purchased broad spectrum antibiotics.

In the same month, on August 27, 1967, a defendant in another Conover patent infringement action by Pfizer filed a counterclaim asserting treble damage antitrust claims.

On September 18, 1967, two actions asserting antibiotics antitrust claims were commenced in the Central District of California at Los Angeles. One was a class action on behalf of all retail drug stores and the other was a class action on behalf of all private hospitals.

At the time of the jury verdict on December 29, 1967, there were three actions by plaintiffs and five counterclaims by defendants in which treble damage antitrust claims were alleged on account of purchases of broad spectrum antibiotics.

After the verdict of the jury, something over 140 other and similar actions were commenced.

The claims made in these civil actions are the same as those made by the Commission and in the indictment.

A large number of the actions are brought as class actions under Rule 23 (b) (3) of the Federal Rules of Civil Procedure.

The plaintiffs in the actions may be divided into some separate categories, as follows:

a. government entities;

b. wholesale druggists and retail drug stores;

c. private hospitals, Blue Cross associations and the like;

d. purchasers of antibiotics for uses other than as medicine for human beings, for example, animal feed, animal medication and the like; and

e. all others (a miscellaneous group).

It may be useful to describe more fully the actions by government entities.

Each state, Puerto Rico and the District of Columbia has commenced a sepa-

rate action, except for Delaware and Nevada.

Delaware is an intervenor plaintiff in an action commenced by City of Philadelphia and City of Detroit in the Eastern District of Pennsylvania (68 Civ. 144 there) and transferred here (68 Civ. 4298 here).

Nevada has not commenced an action nor has it intervened in any action.

In addition to actions commenced by states, a number of cities and counties have commenced their own actions against defendants. These are as follows (file numbers are those in this Court):

| | |
|---|---|
| Baltimore | (68 Civ. 4325) |
| Boston | (68 Civ. 4354) |
| Chicago | (69 Civ. 901) |
| Denver | (68 Civ. 4930) |
| Kansas City, Missouri | (69 Civ. 2861) |
| Los Angeles County | (68 Civ. 4341) |
| Memphis | (68 Civ. 1807) |
| Nashville and Davidson County | (69 Civ. 899) |
| New York City | (64 Civ. 1742; counterclaim) |
| Philadelphia and Detroit | (68 Civ. 4298) |
| San Francisco County and City | (68 Civ. 4274) |

There are a number of government entities which are intervenor plaintiffs in the action of City of Philadelphia and City of Detroit. Delaware has already been mentioned. The following cities are intervenor plaintiffs in that action:

Akron, Buffalo, Cleveland, Dearborn, Honolulu, Lansing, Madison Heights, Pittsburgh, Santa Clara, Tampa

The following counties are intervenor plaintiffs in that action:

Allegheny (Pa.)
Erie (New York)
Honolulu (Hawaii)
Summit (Ohio)

The following other government entities are intervenor plaintiffs in that action:

Township of Redford (Mich.)
Board of Education of the Black Horse Pike Regional School District (N.J.)

(The City of Flint, Michigan, was an intervenor plaintiff in that action but has indicated that it prefers to participate in the settlement as a member of a class represented by the State of Michigan in its action (69 Civ. 898 here).)

## F. THE OFFER OF SETTLEMENT MADE BY DEFENDANTS.

Under date of February 6, 1969 (later modified under date of May 9, 1969) the defendants made a written offer of $100,000,000 in settlement of *all* of the following claims:

"A. Claims of states, counties, cities and their political subdivisions and agencies and any other governmental entities (excluding the Federal Government), arising out of their purchases or out of payments to or for the benefit of recipients of welfare or other aid;

"B. Claims of wholesalers, retailers and individual consumers arising out of their purchases, including claims of states as parens patriae on behalf of

their citizens or on behalf of classes including the state as a consumer and all other consumers in the state."

It will be seen that this offer is addressed to claims asserted by government entities (A. above) and by wholesale druggists, retail drug stores and "individual consumers" (B. above).

(At the same time, as already noted, defendants offered a sum in settlement of all claims of private hospitals and like claims; that offer is separate, not involved in the present application, and will not be referred to again.)

The offer of settlement of February 6, 1969 (modified May 9, 1969) was contained in a printed document which set out the general procedural steps contemplated; this document will be sometimes referred to as the "settlement plan".

(A paper dated December 4, 1969 and signed by counsel to defendants was handed at some point to the Court. This paper changes the date "February 6, 1972" in line 17 of page 3 of the settlement plan to "December 31, 1972".)

The procedure set out in the settlement plan was, in brief, that appropriate actions would be determined to be maintained as class actions; that the required (Fed.R.Civ.P. 23(c) (2)) notices with option to be excluded from the class would be directed to all class members; that if exclusions were "substantial and material" defendants could withdraw; that if defendants should go forward with the settlement, the $100,000,000 settlement figure would be reduced appropriately to reflect the exclusions from class membership; that any plaintiff accepting the settlement could present to the Court a Proposed Plan for the allocation of the global settlement amount; that if all plaintiffs did not agree on a common Plan, then defendants might elect to proceed with any Proposed Plan or modification thereof; that the proposed compromise embodied in the agreed common Plan or the Plan elected by defendants would be submitted to the Court for approval under Rule 23(e) of the Federal Rules of Civil Procedure; that adminis-

trative and other costs incurred in the settlement procedure should be paid from the settlement amount; and that if the settlement were approved, all claims covered thereby would be "satisfied or otherwise terminated".

## G. COURT PROCEEDINGS ON THE PROPOSED COMPROMISE

### 1. The May 26, 1969 Order

The offer of settlement having been accepted in principle by nearly all the plaintiffs to which it was addressed, an order was filed on May 26, 1969 which began the administration contemplated by the offered settlement. This order was made after notice to counsel for all parties affected and after a hearing.

The order treated the settling plaintiffs in two groups: (1) the states, Puerto Rico and the District of Columbia (often referred to collectively as "the states"); and (2) wholesalers and retailers.

As to the group (1) plaintiffs, the May 26, 1969 order provided a "temporary national class action" (West Virginia v. Pfizer, 68 Civ. 240 in this Court) from which any of the plaintiff states *not* accepting the offer of settlement could by notice exclude themselves. Alternatively, any state (as defined in the order) which on or before June 10, 1969 filed with the Clerk of this Court a statement in writing that it accepted the offer of settlement but did not wish to become a member of the "temporary national class" could maintain its action as a class action and become an accepting state without having been included in the "temporary national class". A number of states accepted the offer of settlement under this alternative procedure. It was provided that as to the states accepting the offer of settlement, each action commenced by them was to be maintained as a class action (Fed.R. Civ.P. 23(c) (1)) for two classes, described in detail in the order but in summary as follows: (a) state, county, and city hospitals and other institutions; and (b) individual members of the con-

suming public who bought antibiotics in the state.

The May 26, 1969 order provided that city and county government entities which as plaintiff or intervenor plaintiff had pleaded by June 10, 1969 a class claim on behalf of consumers resident within their territorial limits could maintain a class action as proper representatives of the class.

As to the group (2) plaintiffs, the May 26, 1969 order provided that those actions commenced by wholesale druggists and retail drug stores which had accepted the offer of settlement were consolidated as the "consolidated wholesaler-retailer class action". The actions so consolidated were listed in the order; as to them the caption usually employed is that of Alpine Pharmacy, Inc. (69 Civ. 559 here), the first in alphabetical order. It was determined that the consolidated action was to be maintained as a class action. The members of the class were specified to be all purchasers of broad spectrum antibiotics in any of the states who bought "for resale at wholesale or retail". The order provided that the plaintiffs and class members in the consolidated action were to be represented by a committee of counsel comprised of all counsel then of record in the actions consolidated.

The May 26, 1969 order stated that the class action determinations and the classes established were for the purpose of administering the proposed settlement.

## 2. Acceptances of Settlement Offer by Government Entities

The May 26, 1969 order was directed to the states as notice to members of the "temporary national class" (Fed. R.Civ.P. 23(c) (2)) and copies of the order were sent to each member of the class.

All the states accepted the offer of settlement except California, Hawaii, Kansas, North Carolina, Oregon, Utah and Washington.

It will be remembered that Nevada did not commence an action nor intervene in an action. Nevada accepted the settlement offer, however, because it did not elect to be excluded from the "temporary national class" after service on it of the May 26, 1969 order. For purposes of administration of the settlement offer, Nevada, its institutions and consumers, are members of classes represented in the class action, West Virginia v. Pfizer (68 Civ. 240 here).

All the other government entities accepted the settlement offer except Kansas City (Missouri) which excluded itself from the settlement by notice filed June 10, 1969.

## 3. Notices Under Rule 23(c) (2)

Having determined that certain actions were to be maintained as class actions, it was then necessary to direct to members of the classes the notice required by Rule 23(c) (2).

The May 26, 1969 order had instructed the class representatives to submit drafts of notices. The Court then prepared the notices and, by orders filed June 16, 1969 (and in a few actions modified by later orders), these were directed to be sent out.

As to the class actions by government entities, two orders were filed in each such action in which two classes, institutions and consumers, were represented and one order was filed in each such action in which one class, consumers, was represented.

The order as to institutional class members directed notice by first class mail on or before June 26, 1969 to all government entities and institutions within the state. The mailing list of class members was to be supplied by the parties, usually the class representative. The notice described the situation generally and included a copy of the settlement plan. The class members were given until August 1, 1969 to exclude themselves from the class.

The order as to consumer class members directed that notice be given by publication of the prescribed form of notice on or about July 1, 1969 in every daily English and Spanish language

newspaper of general circulation in the state. The consumer class members were given until August 1, 1969 to exclude themselves from the class. They were also notified that if they wished to make a claim in the settlement they were required to file by August 16, 1969 a verified statement or a statement certified by the supplier. The notice to consumers also contained this statement: "If you do not make an individual claim by August 16, 1969, that will constitute an authorization to the Attorney General [in the District of Columbia and in some other government entities the chief law officer was referred to by a different title] to utilize whatever money he may recover as your representative for the benefit of the citizens of your State in such manner as the Court may direct."

As to the consolidated wholesaler-retailer class action, one order as to notice was filed on June 16, 1969 and modified in one respect by order filed June 18, 1969. Notice in the prescribed form was directed to be given by first class mail on or before June 19, 1969. The names and addresses of the class members were to be obtained by using the mailing list of Clark-O'Neill, Inc., 1 Broad Avenue, Fairview, New Jersey 07022, a business engaged in maintaining a mailing list of wholesale drug houses and retail drug stores in the United States. The wholesaler-retailer class members were given until August 1, 1969 to exclude themselves from the class. They were also given until August 16, 1969 to file a claim in the settlement; a claim form to be verified was annexed to the notice.

The notices were duly given as provided in the orders. The notices were in all instances signed by the Clerk and those sent by mail were sent in penalty envelopes with the Clerk's return address. All notices of exclusion and all claims were required to be addressed to the Clerk. Counsel for the parties, Clark-O'Neill, Inc. and an advertising agency assisted the Clerk. Defendants were directed in the orders to advance the necessary funds (the newspaper notices cost about $130,000), to be reimbursed as an expense of the settlement if the settlement proposed were finally approved by the Court.

### 4. Problems in California

As noted above, the State of California chose to reject the offer of settlement. At the time of the Rule 23(c) (2) notices, Los Angeles County and San Francisco County had chosen to accept the offer of settlement; so also had the City of Santa Clara, California, an intervenor plaintiff in the City of Philadelphia and City of Detroit action.

Out of this situation arose the issue whether within a state rejecting the settlement offer, a smaller political subdivision (county or city) having its own action against defendants could maintain such action as a class action and accept the offer of settlement. The State of California protested that it could not be done.

Los Angeles County, wishing to accept the settlement, sought to amend its complaint so as to allege claims on behalf of consumers within its geographical limits. California opposed. This Court ruled that within a rejecting state a county, but not a city, could maintain a class action independent of the state. By order filed June 18, 1969, the amendment sought by Los Angeles was allowed and a determination made that Los Angeles could maintain its action as a class action. By separate order filed the same date, Rule 23(c) (2) notice was directed to be given to the consumer class represented by Los Angeles County by publication in newspapers there. A stay sought by California was denied, as well as a statement under 28 U.S.C. § 1292(b).

San Francisco (a county as well as a city), wishing to accept the settlement, had, by order on a stipulation filed April 29, 1969, amended its complaint to assert claims on behalf of consumers within its geographical limits. By order filed June 19, 1969, it was determined that the action of San Francisco could be maintained as a class action. By separate order filed the same date,

Rule 23(c) (2) notice was directed to be given to the consumer class represented by San Francisco by publication in newspapers there.

California applied to the Court of Appeals for a stay pending an application for an extraordinary writ. The Court of Appeals denied a stay on June 25, 1969 (California v. Wyatt, MR–3097; (Hays, Feinberg, CJJ., Jameson, D.J.). Mr. Justice Harlan thereafter denied a stay.

The principle of the ruling (as stated above) dictated that Santa Clara, a city and not a county, should not maintain a class action on behalf of consumers within its geographical limits. By order filed June 19, 1969, it was so provided and no Rule 23(c) (2) notice was given to any consumers within the geographic limits of Santa Clara.

### 5. Responses to the Rule 23(c) (2) Notices

Notices of exclusion were filed by 61 members of the classes consisting of government entities and institutions.

Notices of exclusion were filed by 42 members of the classes consisting of individual purchasers of antibiotics.

Notices of exclusion were filed by about 1500 members of the class consisting of wholesalers and retailers. In connection with the number of exclusions from this class, it may be noted that under date of June 27, 1969 the Executive Director of the American Pharmaceutical Association wrote about the settlement offer to executives of state pharmaceutical associations. Among other things, this letter stated that American Pharmaceutical Association "has urged pharmacists not to submit claims against the settlement funds unless actual damage can be demonstrated * * *" and further that "adverse public reaction could well result if pharmacists obtain a share of the settlement funds and do not pass amounts received on to patients".

Claims were filed by about 38,000 members of the classes consisting of individual purchasers of antibiotics. The face amount of the purchases made by these claimants is something in excess of $16,500,000.

Claims were filed by somewhat more than 4100 members of the class consisting of wholesalers and retailers. The face amount of the purchases made by these claimants is in excess of $345,000,000.

### 6. Proposed Plans of Allocation

The defendants did not elect to withdraw from the settlement by reason of the exclusions from the various classes. They were given such withdrawal right by paragraph III.B of the settlement plan. They elected to go forward with the settlement.

The settlement plan provided that any plaintiff accepting the settlement could file by a date determined by a formula (September 2, 1969, it appears) a "Proposed Plan for the Allocation of the Fund". The allocation is of importance, of course, because the offer of defendants was of an unallocated total sum for all plaintiffs and all classes.

Proposed Plans of Allocation were filed as follows:

a. by counsel for the State of Alabama and for 29 other states, Puerto Rico, the District of Columbia, Chicago, New York City, Memphis and Nashville (the "Alabama Plan");

b. by counsel for the State of Connecticut and for 5 other states, Baltimore, and Denver;

c. by counsel for Los Angeles County;

d. by counsel for the City of Philadelphia and City of Detroit and for intervenor plaintiffs in that action, including the State of Delaware;

e. by counsel for the County and City of San Francisco;

f. by the committee of counsel in the consolidated wholesaler-retailer class action; and

g. by counsel for the State of Vermont.

### 7. The Alabama Plan

This plan will be described in some detail because, with modifications, it

was later adopted by defendants and moreover was the most comprehensive of the plans filed.

The Alabama Plan divided the $100,000,000 sum offered between all the claims asserted in all the relevant actions, even though some plaintiffs had rejected the settlement offer. The division having thus been made, the Plan affords a basis for reducing the $100,000,000 amount to reflect the claims represented by plaintiffs rejecting the settlement offer. Provision for such reduction was made in paragraph III.D of the settlement plan.

The theory of the Alabama Plan is that claims of government entities on account of institutional purchases and welfare reimbursements are entitled to first priority on the settlement fund. The reasoning is that the dollar amount of these purchases and payments can be calculated with reasonable accuracy and the damages, on the assumption of liability, are direct and provable. The dollar amount of purchases by individual consumers unreimbursed (that is, not welfare patients) are not so easily calculated and as to claims of wholesalers and retailers these may be affected, among other things, by the "pass-on" defense.

The allocation for institutional purchases starts with the dollar amount of sales of antibiotics to government entity institutions, wholesalers and retailers for the period believed by the proponents to be relevant. Sales information was supplied by defendants. Some part of the sales to wholesalers and retailers were actually sales through them to government entity institutions as "drop-shipments" by defendants with a handling allowance to the wholesalers or retailers concerned. After adjustment for these sales, it was determined that the dollar amount of sales to government entity institutions was $121,620,000.

It was then assumed that, absent the claimed antitrust law violations, competitive prices would have been much lower; it was calculated that the prices actually charged contained an overcharge of 66⅔%. Allowing for uncertainties in law and in fact, it was concluded that for settlement purposes an overcharge figure of 40%–41% could properly be used. This figure is said to have been used in negotiations which preceded the $100,000,000 offer by defendants. Applying a 41% overcharge figure to the sales figure of $121,620,000 yielded a figure of $49,864,200 or, rounded off, $50,000,000.

During what was felt to be the relevant period, many states, counties and cities had public assistance (welfare) programs under which eligible persons having prescriptions for antibiotics could obtain these from drug stores which in turn would be reimbursed by the public authorities.

It was calculated that $48,600,000 was spent by states, counties and cities as reimbursement to vendors for antibiotics delivered to welfare patients. This calculation was based on information from the Department of Health, Education and Welfare that $900,000,000 had been paid (in the period believed to be relevant) as public assistance for drugs of all kinds. As a result of special studies and of earlier surveys in several localities, it was concluded that about 5.4% or $48,600,000, of the $900,000,000 represented vendor reimbursement for antibiotics. The federal government paid about 50% of the public assistance programs. The proponents believed that claims on account of the 50% public assistance paid by the federal government were not covered by the settlement offer (whether this be true or not need not be, and is not, determined). For allocation purposes, the share paid by states, counties, and cities was used, that is, 50% of $48,600,000, or $24,300,000.

It was then assumed that, absent the claimed antitrust law violations, competitive prices by defendants to vendors (retail drug stores, mainly) would have been lower and reimbursement payment would have been much lower; it was then calculated, but by a different method from that employed for institutional purchases, that the vendor reim-

bursement sum of $24,300,000 contained an overcharge of 66⅔%; applying the same overcharge figure for settlement purposes of 41% to the vendor reimbursement sum of $24,300,000 resulted in a settlement figure of $9,963,000 or, rounded off, $10,000,000.

The allocation therefore was $60,000,000 to government entities—of which $50,000,000 was for institutional purchases and $10,000,000 for vendor reimbursement.

The allocation of $60,000,000 to government entity claims left $40,000,000 to be divided between (a) claims of wholesalers and retailers and (b) claims of individual unreimbursed purchasers (consumers).

The amount to be allocated to claims of wholesalers-retailers was first determined. The proponents felt that in principle nothing should be allocated to these claims because the members of this class sold nearly all their antibiotics to consumers and passed on any and all overcharge. (This problem was considered in a different context in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).) It was also taken into consideration by the proponents that the offer of defendants contemplated and the Alabama Plan provided for, payments in settlement to individual purchasers (consumers). The proponents felt that members of the wholesaler-retailer class actually made *more* profits as a result of the assumed violations of law. However, in order to secure the agreement of the wholesaler-retailer class to the settlement, a "nuisance value" allocation of $3,000,000 (a somewhat arbitrary figure) was made to this class.

This left $37,000,000 for the claims of individual purchasers (consumers). It

will be remembered that some 38,000 consumers filed claims having a face amount of something in excess of $16,500,000. In this connection, the Alabama Plan (pp. 24, 25) makes these statements:

"As of midnight August 16, 1969, some 38,000 individual consumers filed claims in accordance with this Court's July 1, notice. This is the first time that individual consumers—those who actually paid the overcharge caused by a defendant's antitrust violations—will participate in an antitrust setlement. The $37,000,000 fund will provide a basis for payment of all individual consumer claims and will also provide a surplus from which the indirect benefit contemplated by this Court's July 1 notice may be conferred upon consumers as a whole.

\* \* \* \* \* \*

"After payments to individual consumers who have filed claims in accordance with the Court's notice are deducted from each entity's consumer fund, the balance, if any, should be held for distribution in accordance with each entity's internal, or second-stage allocation plan. Most entities joining in this allocation plan will seek court approval in their second-stage allocation plans for an additional period of time within which individual consumers may be permitted to file claims. Others may seek court approval to use the balance of their consumer fund for a public health purpose. This Court has the power, and, of course, should exercise its equitable control over these funds for the benefit of all consumers."

The Alabama Plan, to recapitulate to this point, divided the $100,000,000 as follows:

| | |
|---|---:|
| Government entity claims | |
| institutional purchases | 50,000,000 |
| vendor reimbursement programs | 10,000,000 |
| Individual purchaser claims | 37,000,000 |
| Wholesaler-retailer claims | 3,000,000 |
| | $100,000,000 |

The next problem in the allocation was to divide the $50,000,000 fund for institutional purchases between the various government entity plaintiffs acting as class representatives. This was done by use of the number of hospital beds in institutions of, or represented by, each such plaintiff, applied as a percentage of the total number of hospital beds in the United States and Puerto Rico. Figures on hospital beds were taken from the American Hospital Association Guide for the years 1955, 1961 and 1967 (as to certain hospital beds in Puerto Rico, figures were taken from the Puerto Rico Hospital Registry, as being more complete). The percentage figure was then obtained for each of the years 1955, 1961 and 1967; the average of these three percentages was used in making the division of the $50,000,000 amount.

A similar problem was the division between government entity plaintiffs in respect of the $10,000,000 vendor reimbursement fund. Some states had no such public assistance programs and thus were excluded from any share of this fund. In dividing the $10,000,000 amount between the states having public assistance vendor reimbursement programs, the basic information was obtained from a yearly publication "Source of Funds Expended for Public Assistance Programs" published by the Department of Health, Education and Welfare, Social Security Administration, Bureau of Public Assistance, Division of Program Statistics and Analysis. This information showed for each state the dollar amount of vendor reimbursement for drugs supplied for each year under public assistance programs, broken down (after 1959) by type of program (that is, Old Age Assistance, Aid to Families with Dependent Children and the like). The special studies and earlier surveys, to which reference has been made, indicated for each type of program the percentage of all drugs attributable to antibiotics. By use of these percentages it could be calculated how much each state spent for antibiotics under vendor reimbursement programs (where no breakdown by program was available, as in 1959, a slightly different method had to be used). It was then determined what percentages these amounts were of the total amount spent by all states for antibiotics under vendor reimbursement programs. These percentages were then applied to the $10,000,000 amount to determine the share of each state in that amount.

The $37,000,000 which had been allocated to claims of individual purchasers (consumers) had to be divided into the amount applicable to each class of consumers represented by each government entity plaintiff. This division was made on the basis of the percentage of the total population (including Puerto Rico) represented by the population of each government entity plaintiff. For this purpose, the 1960 census was employed.

Before establishing the final division of the $50,000,000 fund for institutional purchases, an adjustment was made for certain institutions which had elected to exclude themselves from the class represented but the beds of which had been included in the data on which a tentative division had been made.

No adjustment was made for wholesaler-retailer or for consumer class members who had elected to exclude themselves from their respective classes.

As already noted, the Alabama Plan allocated $3,000,000 to the claims of the wholesaler-retailer class.

The final allocations of the Alabama Plan for each government entity plaintiff for (A) institutional purchases, (B) vendor reimbursement programs, and (C) consumers are shown on Exhibit "E" to that Plan. The total is not $97,-000,000 but $82,615,030. This is because the offered settlement amount had to be reduced under the settlement plan so as to reflect those government entity plaintiffs who rejected the settlement. This was done by simply excluding the amounts allocated to them of the $100,000,000 total settlement amount. (Doubtless by oversight Kansas City, Missouri was not taken into account as

a separate government entity plaintiff in any of the divisions of the Alabama Plan and no adjustment was made for Kansas City as a plaintiff rejecting the settlement.)

The Alabama Plan, it will be noted, allocates only to *classes* represented by each plaintiff class representative accepting the proposed compromise. Approval of the proposed compromise and dismissal of the actions as far as claims against defendants are concerned will not end the responsibility of the Court and of the class representative plaintiffs. Further plans of allocation to each member of the classes and plans of distribution must be prepared and approved by the Court.

### 8. The Other Proposed Plans of Allocation

The Plan of Allocation filed by the committee of counsel in the consolidated wholesaler-retailer class action allocated $40,000,000 to the claims of wholesalers and retailers.

The other Plans of Allocation (except that of San Francisco which adopted the allocations of the Alabama Plan) did not allocate anything to the claims of wholesalers and retailers. It was said that anything given to wholesalers and retailers would be a "windfall" to them. Some of the other Plans also differed with the Alabama Plan in that all amounts allocated to government entity plaintiffs and institutions and to consumers were divided on the basis of population, without any special allocation for vendor reimbursement welfare programs.

### 9. Dispute Over Allocation to Wholesaler-Retailer Class; Result of Negotiations

The settlement plan provided (paragraph III.E(1)) that the parties would use their best efforts to agree upon a common Plan of Allocation of the settlement amount; that failing such agreement, defendants could "elect to proceed with any proposed Plan or modification thereof"; but that if the allocation to any government entity plaintiff under a Plan elected by defendants should be less than under a Plan proposed by that plaintiff, then that plaintiff might "withdraw from the settlement". No similar right to withdraw from the settlement was provided in the settlement plan for the wholesalers and retailers.

A very serious issue was the amount to be allocated to the wholesaler-retailer class. The Plan submitted on behalf of that class, it will be remembered, allocated $40,000,000 to wholesalers and retailers, while the Alabama and San Francisco Plans allocated $3,000,000 and the other Plans nothing at all to that class. An increase in any allocation to the wholesaler-retailer class would have resulted in a decrease by that amount in the allocation to government entity plaintiffs. It was stated for the government entity plaintiffs that they would exercise their right to withdraw from the settlement were the wholesaler-retailer allocation increased at their expense. Counsel for the wholesaler-retailer class, on the other hand, indicated that they considered a $3,000,000 allocation insufficient and that they would oppose approval by the Court of any Plan elected by defendants which provided an allocation to wholesalers and retailers of no more than that amount.

After intensive negotiations, of which the Court was kept generally informed, the issue was decided in a manner acceptable to the government entity plaintiffs and nearly all of the committee of counsel for the wholesaler-retailer class. In summary, defendants agreed to deposit the settlement amount forthwith in an escrow account; the interest on the amount in escrow would accrue for the benefit of the wholesaler-retailer class, thus increasing by an amount exceeding $8,000,000 the $3,000,000 proposed for that class by allocation in the Alabama Plan.

During the negotiations to agree upon a common Plan, the State of Vermont withdrew its Plan and adopted the Alabama Plan. Agreement was reached among counsel for the government entity

plaintiffs that they would abide by the decision of the Court as to the fairness of any Plan among those submitted by government entity plaintiffs which the defendants might elect.

10.   Election by Defendants

On October 20, 1969, defendants filed a document, "Election by Defendants to Proceed With a Modified Plan of Allocation". This Election accepts the Alabama Plan in large part but has certain modifications. The chief of these modifications will be mentioned:

a.   the Election accepts the aggregate amounts allocated to each government entity plaintiff for all the classes represented but defendants take no position on the division of this aggregate amount by the Alabama Plan into the three separate parts;

b.   the Alabama Plan, as noted, failed to take into account the withdrawal from the settlement of Kansas City; a reduction in the settlement amount is made by defendants on account of Kansas City;

c.   the Election takes the position that defendants are settling all claims of government entity plaintiffs "for welfare, including any amounts reimbursed by the Federal Government"; this refers to the treatment in the Alabama Plan, as already noted, of payment by the federal government of 50% of public assistance programs; and

d.   the Election includes provision for the deposit by defendants of an escrow fund and explains that this is done so that interest on the escrow fund may be for the benefit of the wholesaler-retailer class, which had found unacceptable the allocation to it in the Alabama Plan.

The amount which defendants undertook in the Election to deposit in escrow for the settlement of all claims asserted in these settling actions was $85,341,215. The comparable figure in the Alabama Plan was $85,615,030 ($82,615,030 from Exhibit "E", page 5, plus $3,000,000 for the wholesaler-retailer class from page 24.)

The $85,615,030 figure from the Alabama Plan had to be reduced by $118,-560 to reflect rejection of the settlement by Kansas City. The figure $118,560 for Kansas City was calculated by the hospital bed formula of the Alabama Plan. Reduction by this amount left a figure of $85,496,470.

The settlement plan provided that administrative and other costs of settlement should be paid "from the Fund". An amount of $152,801.29 for past such expenses paid by defendants and an amount of $27,454 for future estimated such expenses were deducted from the settlement amount. The total of the two deductions was $180,255.29 and after such deductions the settlement amount was $85,316,214.71.

A final adjustment of this amount by the addition of $25,000 was made. This $25,000 was added to the amount to be available for the wholesaler-retailer class and was the result of a special negotiation between certain of the counsel for some of the interested parties. The addition of the $25,000 carried the settlement amount to $85,341,214.71, rounded off to $85,341,215.

The calculation of the settlement amount is explained in some detail in a footnote on pages 3–4 of defendants' "Election".

Of the escrow amount of $85,341,215, the amount for the wholesaler-retailer class was $3,013,939 and the amount for classes represented by government entity plaintiffs was $82,327,276.

11.   The Escrow Order and Agreement

On the day defendants filed their Election, October 20, 1969, the Court filed an order approving the Escrow Agreement and directing defendants to deposit $85,341,215 with the Escrow Agent. This has been done.

The Escrow Agreement is dated October 20, 1969 and is between the five defendants and The Chase Manhattan

Bank as Escrow Agent. A brief reference will be made to some of its principal provisions:

(a) the escrow fund is to be invested "to obtain the best interest yields consistent with safety", etc.;

(b) if there is a final order approving the proposed compromise by November 23, 1970, then on that date the escrow fund shall be divided into two separate such funds, one of $82,327,276 for classes represented by government entity plaintiffs and the other of the balance of the escrow fund for the wholesaler-retailer class;

(c) if there is no final order by November 23, 1970, then the division into two separate funds will take place on December 23, 1970. The effect is thus to give the wholesaler-retailer class the benefit of an additional month's interest on the entire escrow fund;

(d) after division into separate funds, interest on each fund accrues for the benefit of that fund; and

(e) when, as and if there is a final order approving the settlement, the separate funds will be paid over by the Escrow Agent for distribution to class members as directed in orders of the Court.

### 12. Withdrawal of Los Angeles and San Francisco; Addendum to Election of Defendants

For reasons as to which one may only speculate, Los Angeles County and San Francisco County decided to withdraw from the settlement; on December 15, 1969 they filed notices of withdrawal. They purported to exercise the right of withdrawal provided in paragraph III.-E.(1) of the settlement plan and defendants have not contested their withdrawal.

The Election of defendants filed October 20, 1969 had provided for $2,313,645 for claims in the Los Angeles action and $425,825 for claims in the San Francisco action. These aggregate $2,739,470.

On January 20, 1970, defendants filed a document, "Addendum to Election by Defendants to Proceed With a Modified Plan of Allocation". This document contained a proposal by defendants that the settlement amount of $85,341,215 be reduced by $2,739,470 for the Los Angeles and San Francisco withdrawals. This would mean that $82,601,745 of the principal escrow amount of $85,341,215 is being held as the principal amount in escrow for settlement of all claims in these actions.

It may be noted that in response to newspaper notices published in Los Angeles and San Francisco, 541 claims were filed by consumers resident in Los Angeles and these had a face amount of $249,996; there were 132 such claims filed by residents of San Francisco and these had a face amount of $37,418.

### 13. Notices Under Rule 23(e)

At the request of counsel for 31 government entity plaintiffs which had accepted the proposed compromise, an order was made and filed on November 18, 1969 requiring all parties to the 66 settling actions to show cause on December 5, 1969 why notice should not be sent to all class representatives and class members, in form as annexed to the order. The proposed forms of notices were of a hearing to consider whether the proposed compromise should be approved by the Court (Fed.R.Civ.P. 23 (e)).

The return of the order to show cause was postponed to December 15, 1969. On that date, all interested parties were heard. While there was no agreement on the forms of notices, all parties in all actions agreed that notices should be sent out and a hearing held on whether to approve the proposed compromise. (An attorney for certain members of the wholesaler-retailer class (not plaintiffs in any action) objected to any notices or any hearing until it had been determined what amounts would be received in settlement by each member of that class.)

There was further discussion of the forms of notices at hearings held on January 13, 19 and 29, 1970. On January 27, 1970, forms of notices to class members as redrafted by the Court were sent to all counsel who had attended the hearing on December 15, 1969. An explanatory memorandum was also sent and notice was given that the redrafts would be discussed with counsel on February 2, 1970.

The discussion of the forms of notice took place on February 2, 1970, as advised in the explanatory memorandum sent out as stated above.

By an order filed February 4, 1970, the Clerk was directed to mail (by February 24, 1970) a copy of a notice (in the form annexed to the order) to all members of the consumer classes in each of the actions brought by a government entity who had filed claims with the Clerk in response to the notices published on or about July 1, 1969; by the same order the Clerk was directed to arrange for publication of a notice to consumers (in the form annexed to the order) in every newspaper of general circulation (English and Spanish) in each of the government entities accepting the proposed compromise. This newspaper publication is as extensive as that in July 1969. The defendants were anxious that there be such widespread publication; it did not seem, however, that the settlement fund should be burdened with the expense of so extensive a publication. The order provided, therefore, that the publishing costs, to be advanced by defendants, would be reimbursed only to the extent of the cost of publishing in the two newspapers of largest circulation within the territory of each government entity.

By an order filed February 4, 1970, the Clerk was directed to mail (by February 24, 1970) a copy of a notice (in the form annexed to the order) to each member of the wholesaler-retailer class as more specifically described in the order.

By orders filed February 6, 1970 in each of the actions by a government entity in which a class of government institutions is represented, the Clerk was directed to mail (by February 24, 1970) a copy of a notice (in the form annexed to the order) to the chief law officer of each plaintiff, to each county, city or other government entity within the plaintiff, and to each hospital district, hospital and other institution—all as more specifically provided for in the respective orders.

All of the notices advised that a hearing on the proposed compromise would be held on March 24, 1970.

It may be noted that each settling action is separate and is the subject of a separate compromise by payment of a separate amount in compromise; the offer of defendants is such, however, that unless there is a settlement of all of these 66 actions there can be no settlement of any of them. For this reason, as well as for convenience and economy, the hearing was designed to include all actions.

The published newspaper notices to consumers were made shorter than the other notices. This was because such notices were primarily directed to members of the consumer class who had not filed claims and whose interest in the hearing might fairly be regarded as minimal. Expense was also a consideration. Among other things, the newspaper notices advised of the time, place and purposes of the hearing; gave a general description of the actions; advised in what documents on file the details of the proposed compromise could be found; noted that the amount proposed to be paid by defendants in each of the actions "must be divided with the Court's approval among all the claims represented in the actions including those of individual consumers"; and stated that these amounts were subject to reduction for administrative expenses and also "for fees and expenses (as later allowed by the Court) of counsel for plaintiffs in the actions". The published newspaper notices also contained this statement:

"According to notices already given with the Court's approval, each state

and other governmental entity participating in the settlement is authorized to use for the benefit of its citizens in such manner as directed by the Court whatever money is recovered on account of claims of consumers represented in its action who failed to file an individual claim by August 16, 1969."

The notices sent by mail to consumers who had filed claims and to all members of other classes were in more detail.

The notices sent by mail to consumers contained this statement:

"Notices of the pendency of the class actions were widely published in July 1969. These notices advised that each member of a consumer class could take part in the settlement in one of two ways: first, he could file a claim for direct participation in the settlement fund or, second, he could remain in the class but not file a claim, this latter choice constituting an authorization for use for the benefit of all citizens of the government entity involved (in such manner as the Court might direct) of whatever money might be received on account of his purchases of broad spectrum antibiotic drugs."

Attached to the mailed notices to consumers was a list of the separate amounts proposed to be paid by defendants with respect to the total claims represented in each action. Reference was also made to the division of these amounts in the Alabama Plan as between the three different types of claims already explained, and that defendants had taken no position as to that division. It was stated: "The further allocation into sums payable on account of the three types of claims will, however, be considered at the March 24, 1970 hearing as part of the proposed compromise". The same information was given in mailed notices to government institutional class members in government entity actions except that instead of a list of amounts to be paid by defendants in each of the 66 settling actions they were advised of the separate amount to be paid by defendants in their action and how this was divided in the Alabama Plan as between the three types of claims.

The mailed notice to members of the wholesaler-retailer class contained this statement:

"At the hearing on March 24, 1970 the Court will consider whether to enter an order adjudicating that any wholesaler or retailer who failed timely to request exclusion from the class and failed timely to mail a proof of claim has no claim against defendants with respect to purchases of broad spectrum antibiotic drugs and no claim against the settlement fund."

Proofs of the mailing of notices and of the publication of notice in newspapers have been filed.

14. The Settlement Amount Offered and its Proposed Allocation

It may be useful to recapitulate at this point and to set out the amounts proposed to be paid by defendants in settlement of each action as well as the details of the further allocation proposed, recognizing that whatever allocation is approved at this stage must be followed by a further division between members of the several classes.

The amount to be paid to the wholesaler-retailer class is $3,013,939 plus interest on the escrow fund to November 23 or December 23, 1970.

The amount to be paid on account of all claims of all parties plaintiff, and of all classes represented, in the actions of government entities accepting the settlement (numbered 1 through 51 of Exhibit A) is $79,557,269 (subject to some downward adjustment on account of expenses of the settlement not already deducted).

The amounts proposed by defendants to be paid in respect of the claims in each separate action will now be given, and also the proposed allocation of those amounts in the Alabama Plan as between the three classes: (a) government entities on account of institutional purchases ("institutional purchases"), (b)

government entities on account of vendor reimbursements under public assistance programs ("vendor reimbursements"), and (c) government entities on account of individual unreimbursed purchasers ("consumers"). The amounts to be paid by defendants are taken from their Election and its Addendum, with some adjustments later made by them and explained at the end of this section.

The amounts shown as allocated to the three classes will in total be slightly more than the amount shown as proposed to be paid by defendants in each action. This is because the allocations were made in the Alabama Plan without any deduction for administrative expenses payable from the settlement amounts. The same *ratio* shown by the allocations, however, is proposed to be applied to the exact amounts payable by defendants in each action.

It should be noted that the amounts shown as proposed to be paid by defendants are subject to further adjustments downward on account of administrative expenses as finally approved by the Court.

1. The State of Alabama v. Chas. Pfizer & Co., Inc., et al.  68 Civ. 1099
   $2,016,855

| | |
|---|---:|
| institutional purchases | $1,355,000 |
| vendor reimbursements | |
| consumers | 666,000 |
| | $2,021,000 |

2. State of Alaska v. Chas. Pfizer & Co., Inc., et al.  69 Civ. 2357
   $63,969

| | |
|---|---:|
| institutional purchases | $ 10,000 |
| vendor reimbursements | 6,000 |
| consumers | 48,100 |
| | $ 64,100 |

3. The State of Arizona and The County of Maricopa v. Chas. Pfizer & Co., Inc., et al.  69 Civ. 1698
   $530,310

| | |
|---|---:|
| institutional purchases | $ 265,000 |
| vendor reimbursements | |
| consumers | 266,400 |
| | $ 531,400 |

4. The State of Arkansas v. Chas. Pfizer & Co., Inc., et al.  69 Civ. 778
   $860,831

| | |
|---|---:|
| institutional purchases | $ 500,000 |
| vendor reimbursements | |
| consumers | 362,600 |
| | $ 862,600 |

5. The State of Colorado v. Chas. Pfizer & Co., Inc., et al.  68 Civ. 5141
   $761,735

| | |
|---|---:|
| institutional purchases | $ 395,000 |
| vendor reimbursements | 113,000 |
| consumers | 255,300 |
| | $ 763,300 |

6. City and County of Denver v. Chas. Pfizer & Co., Inc., et al.  68 Civ. 4930
   $204,480

| | |
|---|---:|
| institutional purchases | $ 105,000 |
| vendor reimbursements | |
| consumers | 99,900 |
| | $ 204,900 |

7. State of Connecticut v. Chas. Pfizer & Co., Inc., et al.  68 Civ. 4323
   $932,084

| | |
|---|---:|
| institutional purchases | $ 215,000 |
| vendor reimbursements | 201,000 |
| consumers | 518,000 |
| | $ 934,000 |

8. City of Philadelphia and City of Detroit v. Chas. Pfizer & Co., Inc., et al., 68 Civ. 4298

State of Delaware:  $158,175

| | |
|---|---:|
| institutional purchases | $ 65,000 |
| vendor reimbursements | 1,000 |
| consumers | 92,500 |
| | $ 158,500 |

Tampa, Florida:  $130,232

| | |
|---|---:|
| institutional purchases | $ 75,000 |
| vendor reimbursements | |
| consumers | 55,500 |
| | $ 130,500 |

Honolulu, Hawaii:  $113,367

| | |
|---|---:|
| institutional purchases | $ 10,000 |
| vendor reimbursements | |
| consumers | 103,600 |
| | $ 113,600 |

Detroit, Michigan:  $539,292

| | |
|---|---:|
| institutional purchases | $ 200,000 |
| vendor reimbursements | |
| consumers | 340,400 |
| | $ 540,400 |

Dearborn, Michigan:  $22,154

| | |
|---|---:|
| institutional purchases | $ |
| vendor reimbursements | |
| consumers | 22,200 |
| | $ 22,200 |

Lansing, Michigan:  $22,154

| | |
|---|---:|
| institutional purchases | $ |
| vendor reimbursements | |
| consumers | 22,200 |
| | $ 22,200 |

Madison Heights, Michigan:  $7,385

| | |
|---|---:|
| institutional purchases | $ |
| vendor reimbursements | |
| consumers | 7,400 |
| | $ 7,400 |

Township of Redford, Michigan: $14,770

| | |
|---|---:|
| institutional purchases | $ |
| vendor reimbursements | |
| consumers | 14,800 |
| | $ 14,800 |

736

Buffalo, New York: $107,080
institutional purchases $
vendor reimbursements
consumers 107,300
$ 107,300

Erie County, New York: $380,518
institutional purchases $ 255,000
vendor reimbursements 19,000
consumers 107,300
$ 381,300

Akron, Ohio: $59,079
institutional purchases
vendor reimbursements
consumers $ 59,200
$ 59,200

Cleveland, Ohio: $262,061
institutional purchases $ 85,000
vendor reimbursements
consumers 177,600
$ 262,600

Summit County, Ohio: $44,309
institutional purchases $
vendor reimbursements
consumers 44,400
$ 44,400

Philadelphia, Pennsylvania: $935,078
institutional purchases $ 530,000
vendor reimbursements
consumers 407,000
$ 937,000

Pittsburgh, Pennsylvania: $121,850
institutional purchases $
vendor reimbursements
consumers 122,100
$ 122,100

Allegheny County, Pennsylvania: $221,744
institutional purchases $ 15,000
vendor reimbursements
consumers 207,200
$ 222,200

9. The District of Columbia v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 2778
$450,474
institutional purchases $ 295,000
vendor reimbursements 1,000
consumers 155,400
$ 451,400

10. The State of Florida v. Chas. Pfizer & Co., Inc., et al. 67 Civ. 4143
$3,125,706
institutional purchases $1,813,530
vendor reimbursements 364,000
consumers 954,600
$3,132,130

11. The State of Georgia v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 153
$2,667,543
institutional purchases $1,870,125
vendor reimbursements
consumers 802,900
$2,673,025

12. State of Idaho v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 897
$366,148
institutional purchases $ 230,000
vendor reimbursements
consumers 136,900
$ 366,900

13. The State of Illinois v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 273
$4,492,660
institutional purchases $2,154,593
vendor reimbursements 1,019,000
consumers 1,328,300
$4,501,893

14. The City of Chicago v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 901
$804,846
institutional purchases $ 85,000
vendor reimbursements
consumers 721,500
$ 806,500

15. The State of Indiana v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 3157
$2,534,691
institutional purchases $1,390,000
vendor reimbursements 199,000
consumers 950,900
$2,539,900

16. The State of Iowa v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 4297
$1,647,015
institutional purchases $ 815,000
vendor reimbursements 273,000
consumers 562,400
$1,650,400

17. The Commonwealth of Kentucky v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 4453
$1,339,148
institutional purchases $ 515,000
vendor reimbursements 209,000
consumers 617,900
$1,341,900

18. The State of Louisiana v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 1380
$2,514,133
institutional purchases $1,630,000
vendor reimbursements 227,000
consumers 662,300
$2,519,300

19. The State of Maine v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 916
$244,613
institutional purchases $ 49,016
vendor reimbursements
consumers 196,100
$ 245,116

20. The State of Maryland v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 4324
$945,357
institutional purchases $ 395,000
vendor reimbursements 112,000
consumers 440,300
$ 947,300

21. The Mayor and City Council of Baltimore v. Chas. Pfizer & Co., Inc., et al., 68 Civ. 4325
$601,165
institutional purchases $ 410,000
vendor reimbursements
consumers 192,400
$ 602,400

22. The Commonwealth of Massachusetts v. Chas. Pfizer & Co., Inc., et al., 68 Civ. 4355

$2,638,078

| | |
|---|---:|
| institutional purchases | $ 925,000 |
| vendor reimbursements | 812,000 |
| consumers | 906,500 |
| | $2,643,500 |

23. City of Boston v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 4354

$696,169

| | |
|---|---:|
| institutional purchases | $ 425,000 |
| vendor reimbursements | 132,000 |
| consumers | 140,600 |
| | $ 697,600 |

24. The State of Michigan v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 898

$2,924,415

| | |
|---|---:|
| institutional purchases | $1,742,725 |
| vendor reimbursements | |
| consumers | 1,187,700 |
| | $2,930,425 |

25. The State of Minnesota v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 735

$2,447,743

| | |
|---|---:|
| institutional purchases | $1,314,173 |
| vendor reimbursements | 443,000 |
| consumers | 695,600 |
| | $2,452,773 |

26. The State of Mississippi v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 1625

$1,379,455

| | |
|---|---:|
| institutional purchases | $ 938,290 |
| vendor reimbursements | |
| consumers | 444,000 |
| | $1,382,290 |

27. The State of Missouri v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 5180

$2,004,920

| | |
|---|---:|
| institutional purchases | $1,081,440 |
| vendor reimbursements | 47,000 |
| consumers | 880,600 |
| | $2,009,040 |

28. The State of Montana v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 1278

$237,412

| | |
|---|---:|
| institutional purchases | $ 50,000 |
| vendor reimbursements | 51,000 |
| consumers | 136,900 |
| | $ 237,900 |

29. The State of Nebraska v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 2106

$682,437

| | |
|---|---:|
| institutional purchases | $ 354,240 |
| vendor reimbursements | 41,000 |
| consumers | 288,600 |
| | $ 683,840 |

30. The State of New Hampshire v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 4878

$272,241

| | |
|---|---:|
| institutional purchases | $ 100,000 |
| vendor reimbursements | 47,000 |
| consumers | 125,800 |
| | $ 272,800 |

31. State of New Jersey v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 4929

$2,643,368

| | |
|---|---:|
| institutional purchases | $1,200,000 |
| vendor reimbursements | 213,000 |
| consumers | 1,235,800 |
| | $2,648,800 |

32. State of New Mexico v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 4326

$547,275

| | |
|---|---:|
| institutional purchases | $ 255,000 |
| vendor reimbursements | 101,000 |
| consumers | 192,400 |
| | $ 548,400 |

33. The State of New York v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 845

$3,901,881

| | |
|---|---:|
| institutional purchases | $1,965,000 |
| vendor reimbursements | 328,000 |
| consumers | 1,616,900 |
| | $3,909,000 |

34. Chas. Pfizer & Co., Inc. v. The City of New York, et al. 64 Civ. 1742

$5,618,054

| | |
|---|---:|
| institutional purchases | $3,750,000 |
| vendor reimbursements | 296,000 |
| consumers | 1,583,600 |
| | $5,629,600 |

35. The State of North Dakota v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 1626

$242,003

| | |
|---|---:|
| institutional purchases | $ 40,000 |
| vendor reimbursements | 73,000 |
| consumers | 129,500 |
| | $ 242,500 |

36. State of Ohio v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 2019

$3,755,949

| | |
|---|---:|
| institutional purchases | $1,676,068 |
| vendor reimbursements | 393,000 |
| consumers | 1,694,600 |
| | $3,763,668 |

37. The State of Oklahoma v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 5096

$1,051,439

| | |
|---|---:|
| institutional purchases | $ 580,000 |
| vendor reimbursements | |
| consumers | 473,600 |
| | $1,053,600 |

38. The Commonwealth of Pennsylvania v. Chas. Pfizer & Co., Inc., et al., 68 Civ. 1212

$3,410,790

| | |
|---|---:|
| institutional purchases | $ 940,000 |
| vendor reimbursements | 909,000 |
| consumers | 1,568,800 |
| | $3,417,800 |

39. Commonwealth of Puerto Rico v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 806

$1,199,834

| | |
|---|---:|
| institutional purchases | $ 725,000 |
| vendor reimbursements | |
| consumers | 477,300 |
| | $1,202,300 |

40. The State of Rhode Island v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 5112
$424,029

| | | |
|---|---|---:|
| institutional purchases | $ | 95,000 |
| vendor reimbursements | | 156,000 |
| consumers | | 173,900 |
| | $ | 424,900 |

41. The State of South Carolina v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 777
$1,395,831

| | | |
|---|---|---:|
| institutional purchases | $ | 910,000 |
| vendor reimbursements | | 4,000 |
| consumers | | 484,700 |
| | $ | 1,398,700 |

42. The State of South Dakota v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 205
$262,061

| | | |
|---|---|---:|
| *institutional purchases* | $ | 70,000 |
| vendor reimbursements | | 52,000 |
| consumers | | 140,600 |
| | $ | 262,600 |

43. The State of Tennessee v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 1631
$1,557,676

| | | |
|---|---|---:|
| institutional purchases | $ | 971,977 |
| vendor reimbursements | | 45,000 |
| consumers | | 543,900 |
| | $ | 1,560,877 |

44. *The City of Memphis, Tennessee v. Chas. Pfizer & Co., Inc., et al.* 68 Civ. 1807
$289,305

| | | |
|---|---|---:|
| institutional purchases | $ | 190,000 |
| vendor reimbursements | | |
| consumers | | 99,900 |
| | $ | 289,900 |

45. The Metropolitan Government of Nashville and Davidson County v. Chas. Pfizer & Co., Inc., et al., 69 Civ. 899
$146,100

| | | |
|---|---|---:|
| *institutional purchases* | $ | 65,000 |
| vendor reimbursements | | |
| consumers | | 81,400 |
| | $ | 146,400 |

46. The State of Texas v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 4375
$4,640,971

| | | |
|---|---|---:|
| institutional purchases | $2,700,609 | |
| vendor reimbursements | | |
| consumers | | 1,949,900 |
| | $4,650,509 | |

47. *The State of Vermont v. Chas. Pfizer & Co., Inc., et al.* 69 Civ. 915
$101,192

| | | |
|---|---|---:|
| institutional purchases | $ | 20,000 |
| vendor reimbursements | | |
| consumers | | 81,400 |
| | $ | 101,400 |

48. The Commonwealth of Virginia v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 5140
$1,412,522

| | | |
|---|---|---:|
| institutional purchases | $ | 598,825 |
| vendor reimbursements | | 10,000 |
| consumers | | 806,600 |
| | $1,415,425 | |

49. The State of West Virginia v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 240
State of Nevada: $279,433

| | | |
|---|---|---:|
| institutional purchases | $ | 212,807 |
| vendor reimbursements | | 8,000 |
| consumers | | 59,200 |
| | $ | 280,007 |

State of West Virginia: $867,648

| | | |
|---|---|---:|
| institutional purchases | $ | 338,031 |
| vendor reimbursements | | 154,000 |
| consumers | | 377,400 |
| | $ | 869,431 |

50. The State of Wisconsin v. Chas. Pfizer & Co., Inc., et al. 68 Civ. 91
$1,940,548

| | | |
|---|---|---:|
| institutional purchases | $ | 906,936 |
| vendor reimbursements | | 231,000 |
| consumers | | 806,600 |
| | $1,944,536 | |

51. State of Wyoming v. Chas. Pfizer & Co., Inc., et al. 69 Civ. 900
$343,479

| | | |
|---|---|---:|
| institutional purchases | $ | 246,585 |
| vendor reimbursements | | 31,000 |
| consumers | | 66,600 |
| | $ | 344,185 |

The figures given above for actions 8 and 24 are not quite the same as those shown in the Alabama Plan and the Election of defendants. This is due to mistakes made inadvertently in the Alabama Plan.

Both the City and County of Honolulu are intervenor plaintiffs in the action (numbered 8 above) of City of Philadelphia and City of Detroit. The *County* of Honolulu was overlooked as a settling plaintiff in computing the allocations of the Alabama Plan. The County, however, has no hospital beds additional to those of the City and thus no change in the figures for institutional purchases is required. The County has no vendor reimbursement program and no change in those figures is required. But the County does have a population not included in that of the City; using the percentage formula based on the 1960 census an allocation of $44,400 was required for the consumer class in the County. This meant an addition of $44,-400 to the Alabama Plan figure of $59,-200 for the Honolulu consumer class, or a total of $103,600 for this Honolulu (City and County) class. Adjusted for expenses on the basis used in the October 20, 1969 Election of defendants, this $44,400 was reduced to $44,309 and

the figure for Honolulu (City and County) in the Election increased by the same amount to the $113,367 shown as now proposed in settlement.

The claim of Maybury Sanitorium (based on its hospital beds) was included in the Alabama Plan among those represented in the State of Michigan action (numbered 24 above). This turned out to be a mistake because Maybury Sanitorium, apparently located to the west of and outside the City of Detroit, is in fact operated by, and thus an institution of, the City of Detroit. The claim of Maybury Sanitorium should, therefore, be transferred from the class represented by State of Michigan (action numbered 24) to the class represented by the City of Detroit (action numbered 8). This means an increase of $5000 in the allocation in the Alabama Plan for institutional purchases in the City of Detroit action to $200,000 and a decrease of the same amount in the allocation in the Alabama Plan for institutional purchases in the State of Michigan action to $1,742,725. The $5000 represented in the Alabama Plan by the claim of the Maybury Sanitorium when adjusted for expenses on the basis used in the October 20, 1969 Election of defendants becomes $4990. This amount added to the settlement amount for City of Detroit claims and subtracted from the settlement amount for State of Michigan claims yields the correct figures for the proposal of defendants in settlement of these claims.

The amount shown above for the State of Missouri action (numbered 27 above) as proposed to be paid by defendants in respect of the claims in that action is the same as in the Election of defendants. However, the allocation amounts as between claims in this action for institutional purchases, vendor reimbursements, and consumers are not the same as in the Alabama Plan as filed. This is because, as already explained, the Alabama Plan by oversight did not make an allocation to Kansas City, Missouri, as a separate government entity plaintiff and did not reflect any reduction in the set-tlement amount by reason of rejection of the proposed compromise by Kansas City, Missouri. The figure in the Alabama Plan for institutional purchases in the Missouri action was $1,200,000. This has been reduced by $118,560 to $1,081,-440. The $118,560 is the amount for Kansas City institutional purchases, calculated by the hospital bed formula of the Alabama Plan.

As earlier explained, the City of Santa Clara, California, is an intervenor plaintiff in the action of City of Philadelphia and City of Detroit; an order filed June 19, 1969 determined that the City of Santa Clara should not maintain a class action for consumers. The Alabama Plan contained an allocation of $75,000 to City of Santa Clara on account of claims for institutional purchases. The Election of defendants contained a similar amount for City of Santa Clara, reduced for expenses at the time of election to $74,846. It turns out, however, that the parties had confused the City of Santa Clara and the County of Santa Clara; the figure for "Santa Clara" in the Alabama Plan was calculated by use in the hospital bed formula of the hospital beds of the County; it appears that in the American Hospital Guide there are no hospital beds shown for institutions of the City of Santa Clara and according to the formula employed there should have been no allocation to the City of Santa Clara. Because of this mistake of fact, the parties have now eliminated any proposed payment to City of Santa Clara.

15. Hearing on the Proposed Compromise

In accordance with the several notices, the hearing on the proposed compromise began on March 24, 1970 and continued that day and the following day. No testimony was presented but both before, at, and after the hearing many affidavits, exhibits, and memoranda were submitted.

Three members of the consumer class made statements, two for the proposed settlement and one neither for nor against.

An attorney for a consumer wished to make a statement but since it appeared that this consumer was maintaining an action and was not accepting the settlement, his attorney was not heard.

A member of the wholesaler-retailer class made a statement for the proposed settlement; another made an opposing statement.

Attorneys for many plaintiffs and for defendants were heard in support of the proposed settlement.

An attorney for six persons in Virginia, said to have been individual purchasers and members of the consumer class, was heard at some length in opposition to the proposed compromise. Aside from anything else, his position has to a considerable extent been weakened by the reversal (since the hearing) of the criminal conviction of three of defendants; he said (SM 268): "Suppose it is reversed. We are in a different ball game". It is, of course, possible that the Supreme Court will grant certiorari and reverse; what is significant at this point is the uncertainty of the outcome of the criminal proceeding.

It deserves emphasis that, except for the attorney for the six Virginians, no one at the hearing expressed any opposition to the *total* amount offered by defendants to be paid in settlement.

The only opposition was as to two aspects of the allocation.

An attorney for the City of Philadelphia and other government entities, who had been active in negotiating the settlement, ably argued that the allocation of the $97,000,000 among government entity plaintiffs as class representatives should be on the basis of population alone and not by use of any hospital bed or vendor reimbursement formulas. While making this point, the attorney urged (SM 74) that the settlement sum was "good", was "fair", and that "the overall settlement should be approved by the Court".

There was opposition by a number of attorneys for retail drug stores to the $3,000,000 allocation to the wholesaler-retailer class. They urged that $40,000,000 should be allocated to that class. They were fully heard. Attorneys for the Committee of Counsel of the wholesaler-retailer class were heard in support of the allocation, as increased by the interest on the escrow fund.

An attorney for the United States was heard in respect of an aspect of the vendor reimbursement program; his point did not involve either support of, or opposition to, the settlement.

Some messages were received from class members who did not appear at the hearing.

Two messages were received from members of the wholesaler-retailer class, one favoring and one opposing the proposed compromise.

Three consumer members wrote in opposition to the settlement, one because there was an allocation to the wholesaler-retailer class, one because administrative costs were to be paid from the settlement amount, and one because (allegedly) the administrative costs would be wasteful.

No member of any government entity institutional class wrote, either to object to the settlement or to approve it.

## H. PRINCIPLES FOR VIEWING THE PROPOSED COMPROMISE

■ Whether to approve the compromise involves an exercise of discretion. The Court is responsible for the protection of the many class members whose interests are involved but who do not appear in the action. Approval should be given if the settlement offered is fair, reasonable, and adequate. These terms are general and cannot be measured scientifically.

■ The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement. This factor is sometimes referred to as the likelihood of success. The Supreme Court directs the judge to reach "an intelligent and objective opinion of the probabilities of ultimate success should the claim be liti-

gated" and to "form an educated estimate of the complexity, expense, and likely duration of such litigation, * * * and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise". The Supreme Court then emphasizes:

. "Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation."

The quotations are from Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424–425, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968).

Our Court of Appeals has described this factor as the "risk and cost of further litigation". Neuwirth v. Allen, 338 F.2d 2, 3 (2d Cir. 1964).

In this connection, the judgment of counsel to plaintiffs (the class representatives) must be considered as well as the extent of support from interested parties and the presence or absence of good faith bargaining. The nature of any questions of law and issues of fact is also a factor for consideration.

The precedents in this field are collected and discussed in Haudek, The Settlement and Dismissal of Stockholders' Actions, 23 Sw.L.J. 765, 792–801 (1969).

■ There is a further important principle to be observed in respect of judicial consideration of proposed settlements. This is that the judge does not try out or attempt to decide the merits of the controversy. "Any virtue which may reside in a compromise is based on doing away with the effect of such a decision". In re Riggi Bros. Co., Inc., 42 F.2d 174, 176 (2d Cir. 1930), cert. denied under name Woods & Selick, Inc. v. Todd, 282 U.S. 881, 51 S.Ct. 85, 75 L. Ed. 777 (1930). See also Schleiff v. Ches. & Ohio Ry. Co., 43 F.R.D. 175, 178–179 (S.D.N.Y.1967) and cases there collected.

## I. CONCLUSION: APPROVAL OF THE PROPOSED COMPROMISE

It has taken far longer to set out the background of this application than will be required to explain the decision.

Negotiations which led to the proposed compromise began in March 1968 and were intensive from about October 15, 1968 through about February 1, 1969. Six attorneys for government entity plaintiffs, all of whom are able and aggressive antitrust law specialists, negotiated with attorneys for defendants with the same qualities. From the affidavits submitted and from the Court's knowledge of the progress of these actions, it is clear that the proposed compromise was the result of good faith bargaining at arms' length.

The situation here is unique in that the evidence on which liability at trial would depend is in substantial part before the Court on this application. That evidence is in the extensive record before the Sixth Circuit Court of Appeals in the Commission proceeding and in the extensive record before our Court of Appeals in the criminal proceeding.

A careful study of those records leads to a conclusion that the chances of recovery in any of these cases are no better than 50–50 and probably should more realistically be called slight. The more significant reasons for this conclusion will be mentioned.

After two exhaustive and lengthy investigations by two agencies of the government, there are no findings of any misconduct by any of the defendants which would show, even prima facie, a violation of the antitrust laws. The only findings of misconduct are those by the Commission that Pfizer and Cyanamid each in substance committed a fraud on the Patent Office; the Commission, however, found that no conspiracy in this respect between Pfizer and Cyanamid had been proved. As to the separate misconduct of Pfizer and Cyanamid before the Patent Office, our Court of Appeals has said that this is relevant to the

issue of violation of the antitrust laws "only insofar as the acts of Pfizer and Cyanamid supported an inference that at the November 1953 meetings they had entered into agreements to fix prices or to exclude others".

In the Commission proceeding, the first Hearing Examiner saw and heard all the witnesses; he considered all the other evidence offered. His opinion was carefully reasoned and his conclusion was that no defendant had violated any law. The Commission did not agree but the opinion of the first Hearing Examiner remains persuasive to a degree and at least shows that the issues are doubtful. In the final result, it was found only that Pfizer and Cyanamid separately had committed fraud on the Patent Office.

Thus, in the Commission proceedings there are no findings of any misconduct by three of the defendants—Bristol, Squibb and Upjohn. As to the other two defendants, Pfizer and Cyanamid, the only finding of misconduct has to do with patent prosecutions in the Patent Office. Aside from serious questions of law about the effect of this misconduct, it would not itself constitute any violation of the antitrust laws; at best, it might arguably be some evidence of an attempt to monopolize.

The misconduct also raises a troublesome question of patent law. This is the question whether the presence of tetracycline in the broth or in the product (Aureomycin) would be sufficient to justify denial of a patent on tetracycline. The inherent production of tetracycline was not known before Conover and did not appear to have imparted any utility to Aureomycin. Hearing Examiner Piper concluded that tetracycline was therefore patentable, citing (among other decisions) Parke Davis & Co. v. H. K. Mulford Co., 189 F. 95 (C.C. N.Y.1911; L. Hand, J.), affirmed 196 F. 496 (2d Cir. 1912). The Commission disagreed and Judge (then Commissioner) Higginbotham wrote ably on the subject. It is not necessary on this application to decide the question of pat-

ent law. Its significance is that it exists and that the answer is not clear.

In the criminal proceeding, the jurors required a considerable time to reach a verdict and were clearly puzzled by the Parke Davis situation. Our Court of Appeals found, among other things, that defendants were wrongly restricted in argument about the Parke Davis situation and that the Court had mistakenly charged about Parke Davis. Whether the jury would have otherwise convicted is at least doubtful. The reversal of the judgment of conviction leaves the criminal proceeding without substantial effect at this point except as it shows that the outcome of a jury trial and any appeals is highly problematical; the prima facie effect of a final judgment in a criminal proceeding (15 U.S.C. § 16) is at least postponed to a date long in the future.

The Parke Davis situation, as developed in the evidence at the criminal trial, is itself a ground for feeling that recovery by plaintiffs is not likely. The situation is, according to the opinion of the Court of Appeals, that Parke Davis was not a member of any conspiracy; that it had the second largest share of the antibiotics market; that it made some 24% of all sales (and thus sold more than four of the defendants here); that its prices were the same as those of defendants; and that its other marketing practices were the same as those of defendants.

Not only is it uncertain that any plaintiff can secure a jury verdict. It is also uncertain whether judges or justices will find the evidence sufficient to support any such verdict.

There is no direct evidence of any price fixing or of any conspiracy. Such evidence as there is must come almost entirely from the defendants themselves and, as the Court of Appeals noted, "the facts may be said to be virtually undisputed". Before the first Hearing Examiner and at the criminal trial, executives of defendants testified. They denied the existence of any conspiracy or any price

fixing. Even if a jury chose to disbelieve such testimony, it is at least questionable whether there is other evidence sufficient to support a verdict for a plaintiff.

The Court of Appeals did not reach the issue of the sufficiency of the evidence to support the criminal conviction. As before noted, the dissenting judge found the evidence sufficient but "not overwhelming". Of course, the standard of proof in a civil action is not as high as that in a criminal proceeding.

In respect of damages, there are a number of doubtful questions both of law and of fact. There is no occasion to discuss these in any detail.

One of the questions of law, for example, is whether the Commission proceeding tolled the statute of limitations so that damages could be recovered for a 4 year period before July 1958 when that proceeding was commenced. This depends on whether the Federal Trade Commission Act is part of the "antitrust laws" as that term is used in Section 5(b) of the Clayton Act (15 U.S.C. § 16(b)). It is not within the definition of the term in the Clayton Act (15 U.S.C. § 12) and there are two decisions that Commission proceedings do not toll the statute of limitations. Laitram Corp. v. Deepsouth Packing Co., 279 F.Supp. 883 (E.D.La.1968); Rader v. Balfour, 1969 Trade Cas. ¶ 72,709 (N.D.Ill.1968). A contrary result was reached in Lippa's, Inc. v. Lenox, Inc., 305 F.Supp. 182 (D.Vt.1969).

One of the questions of fact, for example, is whether, if there were any conspiracy, it "ended in July 1960", as Judge Frankel appears to have believed (Record on Appeal 5013a), or whether it continued for several years thereafter, as many of the complaints aver.

In considering the proposed compromise, it seems also to be of importance that (if approved) the substantial amounts of money are available for class members *now*, and not at some distant time in the future. The nature of these actions is such that a final judgment, assuming it to be favorable, could only be obtained after years of expensive litigation. It has been held proper "to take the bird in hand instead of a prospective flock in the bush". Ladd v. Brickley, 158 F.2d 212, 220 (1st Cir. 1946), cert. denied 330 U.S. 819, 67 S.Ct. 675, 91 L.Ed. 1271 (1947).

The proposed compromise is supported by a very high percentage of all the plaintiffs to which it was offered. The law officers of forty-three states, Puerto Rico, and the District of Columbia—almost all with retained specialist counsel —urge approval of the settlement. All except three of the cities ask approval; among those asking approval is the City of New York, whose counterclaim was the earliest of these claims. Nearly all of the wholesalers and retailers ask approval; these include the plaintiffs in the first action commenced for the class of retail drug stores.

The strong support for the proposed compromise is a factor of great weight.

At the same time, it has to be considered that California, six other states, two counties in California, and Kansas City, Missouri, have rejected the offered settlement. These rejecting plaintiffs are represented by able and experienced counsel whose opinions about the proposed compromise must also be taken seriously into account. Even among the best lawyers, however, opinions may, and often do, differ. It is felt that in this instance a misplaced optimism about a highly problematical result has led to the exercise of questionable judgment. The rejection of the settlement occurred, of course, before the criminal convictions of three of the defendants had been reversed by the Court of Appeals. It must also be recognized that ultimately a larger recovery may possibly be obtained by the rejecting plaintiffs than the amount presently available in settlement. However, the chances of this occurring do not seem to be very great.

It is known from past experience that no matter how confident one may be of

the outcome of litigation, such confidence is often misplaced. Merely by way of example, two instances in this Court may be cited where offers of settlement were rejected by some plaintiffs and were disapproved by this Court. The trial in each case then resulted unfavorably for plaintiffs; in one case they recovered nothing and in the other they recovered less than the amount which had been offered in settlement.

In Piccard v. Sperry Corp., 36 F.Supp. 1006 (S.D.N.Y.), affirmed 120 F.2d 328 (2d Cir. 1941), a proposed settlement was disapproved. The action was then tried on the merits, resulting in judgment for defendants (48 F.Supp. 465 (S.D.N.Y.1943), affirmed 152 F.2d 462 (2d Cir.), cert. denied 328 U.S. 845, 66 S.Ct. 1024, 90 L.Ed. 1619 (1946)).

In Upson v. Otis, 155 F.2d 606 (2d Cir. 1946), approval of a settlement was reversed, the Court saying (at 612): "on the facts presented to the district judge, the liability of the individual defendants was indubitable and the amount of recovery beyond doubt greater than that offered in the settlement. Accordingly it was an abuse of discretion to approve the settlement". The action was then tried and plaintiffs obtained a judgment, twice considered by the Court of Appeals (168 F.2d 649, 169 F.2d 148 (1948)). We are told, however, that "the ultimate recovery * * * turned out to be substantially less than the amount of the rejected compromise". Haudek, The Settlement and Dismissal of Stockholders' Actions, 23 Sw.L.J. 765, 794 (1969).

█ It is concluded that for many good reasons the proposed compromise should be approved. This approval extends to the allocation of dollar amounts as between the several actions (reflected in the Election of defendants and set out above) and also to the allocation of dollar amounts in each of the government entity actions as between institutional purchases, vendor reimbursements, and consumers (as reflected in the Alabama Plan and set out above).

The point made by the attorney for City of Philadelphia and others, that division should be on the basis of population, has been carefully considered. Such a method may well be reasonable. But the method employed in the Alabama Plan is also reasonable and it also makes use of objective data from independent, neutral sources. There is no sufficient reason for rejecting the method of division in the Alabama Plan, in the light of the widespread support which it commands.

Specific mention should be made of several matters.

1. Allocation to the Wholesaler-Retailer Class

As shown above, the proposed compromise includes for claims of members of the wholesaler-retailer class the sum of $3,013,939 plus the interest on the escrow fund to November 23 or December 23, 1970.

This allocation, as well as the rest of the proposed compromise, is strongly supported by nearly all the representatives of the wholesaler-retailer class. As before explained, for purposes of administering the settlement all actions on behalf of this class in which the plaintiffs had accepted the settlement were consolidated by the May 26, 1969 order. There were 13 such actions. All counsel of record for any parties plaintiff in these actions were constituted a Committee of Counsel.

Counsel for plaintiffs in 11 of the 13 actions support the present application, urging its approval; counsel for plaintiffs in one of the 13 actions has taken no position; and counsel for plaintiffs in one of the 13 actions have opposed as inadequate the allocation to this class.

Attorneys from the Committee of Counsel for the wholesaler-retailer class argued at the hearing in support of the settlement. Two attorneys for plaintiffs in one of the 13 consolidated wholesaler-retailer actions argued against the allocation proposed for the wholesaler-retailer class, as did two attorneys for

certain members of the class; one attorney for some members of this class said at the hearing: " * * * we are not completely or * * * not opposed to this plan as such, but we are not necessarily in favor of it either" (SM 181).

As earlier explained, representatives of the wholesaler-retailer class unanimously proposed an allocation of $40,-000,000 to that class. Insistence on that figure would almost certainly have destroyed any chance of settlement. Nearly all members of the Committee of Counsel for the class accepted a compromise, under which (in substance) defendants, for the benefit of the wholesaler-retailer class, paid the settlement amount into escrow before they could have been required to make any payment.

The few opposing members of the wholesaler-retailer class are critical of many of the procedural steps taken by the Court. Their criticisms need not be examined in detail. They all concern the orientation of the procedure toward settlement administration rather than toward discovery, decision of law points, and the like. This orientation was deliberately chosen in order to determine which class members wished to settle and which class members wished to litigate. All members were given an option to exclude themselves from their class. It was also recognized that in class actions, orders "may be altered or amended as may be desirable from time to time" (Fed.R.Civ.P. 23(d)).

The only argument of any possible substance for the opposing members of this class is that the damage to the class is easily provable and, as a matter of law, cannot be denied by defendants.

Without attempting to decide the matter, it appears at first glance to be highly doubtful whether wholesalers or retailers suffered any damage whatever. Defendants sold only in dosage form; this means that the wholesaler then sold in the original packages (at a mark-up of 16⅔% or more over cost) and that—

if the retail druggist did not always sell in the original packages but repackaged in varying quantities—at least the retail druggist sold the dosage form just as received from a wholesaler or from a defendant and without any addition, subtraction or combination. To the consumer, antibiotics are sold only by prescription. In some instances the retail druggist may charge his cost, plus a flat professional fee. According to affidavits of experts in the field, however, the overwhelming majority of drug stores in the period 1953–66 charged for prescription drugs a uniform mark-up of 66⅔% over cost. If so, this would mean that any overcharge by defendants in violation of the antitrust laws was passed on to the end use purchaser. The result is that wholesalers and retailers, far from sustaining damages, made substantial profits from any antitrust violations.

It is suggested that the wholesalers and retailers lost sales because of the alleged high prices and that thus they suffered damage. No decision can be made on this record whether in fact the suggestion is true or not. There is persuasive evidence in the Commission proceeding and at the criminal trial that the suggestion is not true. The reason is that doctors prescribe antibiotics and doctors look to the health of the patient rather than to the price of the needed drug.

The representatives of the wholesaler-retailer class, both those in favor of and those opposed to the present proposed allocation, contend that as a matter of law their class members may recover for any illegal overcharges by defendants, whether or not these were collected from the end use consumers. They rely on Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Their reliance might after long litigation prove to be well placed. For present purposes, no decision is required but it is very doubtful, to say the least, that *Hanover* would apply to the situation here; the point must be regarded as highly uncertain.

United charged Hanover more for shoe machinery than would have been charged except for the antitrust law violation. The machinery was then used in making shoes from Hanover designs, using all the necessary materials (leather, thread, cloth, etc.) and applying the labor and skills of the Hanover organization. The use of the machinery was by Hanover, which was in the position of a consumer or end user of the machinery. The machinery was not resold, as were the antibiotics in suit. The illegal overcharge in *Hanover* was merely one of many items of cost; as the Court said, it "was *reflected* in the price charged for shoes sold by Hanover to its customers" (392 U.S. at 488, 88 S.Ct. at 2228, emphasis supplied). Here the antibiotics in dosage forms (capsules, tablets, or other forms) were resold just as obtained from defendants. Nothing was added or changed. The mark-up was applied to the cost and the resultant price was collected from the consumer. The higher the cost, the higher the mark-up, and the higher the profit to the members of this class. The situation here seems much like the " 'cost-plus' contract" referred to in the *Hanover* opinion; the Supreme Court recognized that in such a case it was easier to prove that there were no damages and that the "passing-on defense" might therefore be valid (392 U.S. at 494, 88 S.Ct. 2224).

Whatever the correct answer to this riddle may be, it is difficult to see in these cases any real damage to wholesalers or retailers.

The attitude of the members of the wholesaler-retailer class indicates no real damage to them.

Notices were sent to some 55,000 members of the wholesaler-retailer class. Claims were filed by about 4100 members (of which about 70 were wholesalers). This seems a surprisingly small percentage of claimants to a sum of money known to be available in settlement. At the same time, about 1500 members excluded themselves from the class. We are told by those opposed to the present allocation that "some 1,500

claim forms [were] returned with statements by druggists that they were not damage[d] and therefore wished to make no claim". Several such statements by druggists were read into the record (SM 371–374). Typical is this statement from a druggist in Wisconsin (SM 372):

> "Any pharmacy claiming damages is, in my opinion, guilty of lying. All pharmacies base their retail prices for drugs on their costs, either using a fixed percentage or a professional fee. Either way, they do not suffer damages due to higher wholesale costs of these drugs. If anyone has a complaint, it would be the individual consumer, not the pharmacists."

The Court in *Hanover* also alluded to the danger to the private enforcement of the antitrust laws if a "passing-on defense" were permitted and recovery allowed only to those who had ultimately paid the higher prices generated by an antitrust violation: "These ultimate consumers * * * would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them." 392 U.S. at 494, 88 S.Ct. at 2232. Here, in contrast to the situation in *Hanover,* that danger does not exist, for it is proposed that much of the settlement amount be made available to ultimate purchasers (institutions or individuals) who are before the Court as plaintiffs and class members and who have sustained the burden of the alleged overcharge. Contrast also State of Minnesota v. United States Steel Corp., 299 F.Supp. 596 (D.Minn.1969), appeal docketed, No. 20184 (8th Cir. March 5, 1970).

■ The only possible conclusion is that the allocation proposed for the wholesaler-retailer class is fair and reasonable. It is a matter of real concern that the allocation is too high. The situation is, however, that the excess above $3,013,939 (which excess may well be

$8,000,000 or more) is a further contribution to this class by *defendants* and thus does not reduce the amounts for other classes. If defendants by this means choose to make a settlement possible, the Court should encourage the effort rather than defeat it.

2. The Vendor Reimbursement Claims; Position of the United States

As described before, states, counties and cities under public assistance programs often reimbursed vendors for antibiotics delivered to those receiving such assistance. About 50% of the cost of these programs was paid by the federal government under the Social Security Act (42 U.S.C. § 301 and following).

An attorney representing the United States made a statement at the hearing and has submitted papers afterward. It appears that in a separate action by the United States, not among these 66 settling actions, there are claims against defendants based on contributions of the federal government to public assistance programs of states which made reimbursement to vendors for antibiotics.

The defendants contend now, and will contend in the action of the United States, that the present settlement, if consummated, puts to rest all claims by settling government entities, whether the source of the funds employed for antibiotics purchases was the federal government or otherwise. Defendants also contend that the United States has no claim on account of vendor reimbursement under public assistance programs but that the settling government entities are the proper parties to assert any such claim. It is stipulated by defendants and the settling government entities that their intent was to settle all claims from welfare payments "irrespective of reimbursement by any other entity".

The United States takes the position that it has a "separate and independent claim" which "will not be compromised by a judgment in this action" (Hearing, March 25, 1970, SM 298).

All parties, including the United States, agree that it is not necessary at this time to decide what effect this settlement will have on the claim of the United States. It is enough to note that approval of the proposed compromise indicates no opinion whether the United States has or ever had a claim or, if so, whether the compromise extinguishes such claim.

3. City of Santa Clara and Black Horse Pike Regional School District

In the action of City of Philadelphia and City of Detroit (numbered 8 above) the City of Santa Clara is an intervenor plaintiff and so also is the Board of Education of the Black Horse Pike Regional School District (N.J.). Nothing is proposed to be paid in settlement to these two intervenor plaintiffs and, therefore, they can (if they so desire) continue to prosecute their claims in the action; this action as to them will not on the present record be dismissed.

4. Costs of the Settlement Proceeding

It is part of the proposed compromise that "costs incurred in proceedings" of the settlement, including "administrative costs" shall be paid from the settlement amounts (para VI of the settlement plan). This means that any such "costs" advanced by defendants, to the extent approved by the Court, are to be deducted from the settlement amounts. An affidavit submitted by defendants (Wood affidavit, para 18) gives many of these items. When orders are submitted on this decision, defendants should submit in affidavit form a complete list of all moneys advanced by them at any time for "costs" so that the Court can determine a final figure to be deducted on this account from the settlement amounts.

5. "Ampicillin"; Agricultural Claims

Mention was made at the hearing on March 24, 1970 (SM 30–34) of a drug "ampicillin" and of some civil action by the United States with respect to that

**748**

drug. Except for this mention on March 24, 1970, there is nothing in the record about any such drug. It is impossible, therefore, to say at this time what effect, if any, the consummation of the proposed compromise would have on claims of these plaintiffs, if any, on account of "ampicillin".

Attorneys representing plaintiffs in actions asserting claims on account of purchases of antibiotics for agricultural uses have addressed a request to the Court. This is that it be made clear in the order of approval that the agricultural claims are not affected by this settlement. It is impossible to say at this time what effect, if any, the consummation of the proposed compromise would have on claims on account of purchases of antibiotics for agricultural uses.

6. Determination and Direction Under Fed.R.Civ.P. 54(b)

Since the proposed compromise is being approved, the defendants are entitled to an order in each of these actions directing judgment in their favor dismissing the action as to them (except in action numbered 8 as to intervenor plaintiffs City of Santa Clara and Board of Education etc.). While such a judgment will be final as to them, the action will not be terminated because the Court must reserve jurisdiction for the purpose of distributing the settlement amounts amongst the class representatives and class members and, in this connection, deciding all issues which arise between claimants. Defendants have no concern with these matters and should not be required to involve themselves therein. It is, however, important for the administration of justice that each order approving the proposed compromise and each judgment dismissing an action as against defendants be final before any attempt is made to distribute the settlement amounts. Any appeal from the approval of the proposed compromise should be taken now.

 It seems, therefore, more prudent to include in each order an express determination that there is no just reason for delay and an express direction for the entry of judgment in favor of defendants dismissing the action as to them. Fed.R.Civ.P. 54(b); Republic of China v. American Express Co., 190 F.2d 334 (2d Cir. 1951), 195 F.2d 230 (2d Cir. 1952). But see Barnes v. Osofsky, 373 F.2d 269 (2d Cir. 1967).

The proposed compromise is approved. Settle order in each of these actions.