Michael **SPIEKERMANN**, et al., Plaintiffs,

v.

**WHITTAKER CORPORATION**, Defendant.

No. 74 C 1270.

United States District Court, E.D. New York.

April 7, 1978.

**2**

Bader & Bader by I. Walton Bader, New York City, for plaintiffs.

Kramer, Lowenstein, Nessen, Kamin & Soll by Steven T. Atkins, New York City, for defendant.

### MEMORANDUM AND ORDER

NEAHER, District Judge.

This class action to recover damages from the defendant Whittaker Corporation was originally commenced on September 3, 1974, by the Independent Investors Protective League ("IIPL"), an unincorporated membership association, for alleged violations by Whittaker of the securities laws, including § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, and for common law fraud and deceit. The case has been the subject of extensive discovery by the class representatives and is now before the court for approval of a proposed settlement. For the reasons which follow, the court is of opinion that the proposed settlement is fair and in the best interests of the plaintiff class and should be approved.

The events which gave rise to the action are as follows. Whittaker, a diversified California corporation headquartered in Los Angeles, in late 1967, acquired as a wholly owned subsidiary the Crown Aluminum Industries Corporation ("Crown"), a manufacturer and distributor of aluminum siding with annual sales of about $18 million. Because of Crown's substantial size, annual audits of Crown were conducted between 1967 and 1972 by Whittaker's outside auditor, Arthur Andersen & Co. ("Andersen"), rather than Whittaker's own audit personnel.

In early 1972, Whittaker agreed to sell Crown to the Chamberlain Manufacturing Corporation ("Chamberlain"). Pursuant to the purchase agreement, independent auditors conducted an audit of Crown's assets, including physical inventory. In late April 1972, the audit—carried out jointly by Andersen and Price Waterhouse & Co.—revealed that Crown's stated inventory exceeded actual inventory by $6 million. Further investigation confirmed the shortage, and Whittaker, in the first week of May 1972, publicly announced the results of the audit and investigation.

Although Whittaker originally thought itself the victim of large-scale thefts, its ongoing investigation revealed that the apparent "shortage" was in fact the result of inflated inventory figures reported by Crown personnel beginning in 1969 and continuing through 1971. Whittaker's reconstruction of Crown's actual financial performance for this period required the following recomputations of Whittaker's previously reported earnings for fiscal years 1969, 1970 and 1971: (1) a $420,000 reduction in reported earnings of $31 million for fiscal 1969; (2) an increase in reported net loss for fiscal 1970 from $8.4 million to $10.8 million; and (3) a reduction in reported earnings for fiscal 1971 from $9.5 million to $7.2 million. It is the discrepancy between Whittaker's reported and actual net income for each of these years that forms the basis for this class action.

The original complaint named as defendants Whittaker, various of its officers and

directors, and Arthur Andersen & Co., and contained four claims for relief. Count one charged the defendants with violations of §§ 11, 12(2), 17 and 32(b) of the Securities Act of 1933, and Securities Exchange Act of 1934, arising from material inaccuracies of a registration statement and preliminary prospectus issued by Whittaker on January 31, 1972, caused not only by the Crown inventory shortage, but also by certain allegedly improper accounting methods employed by Whittaker with respect to its income from housing development and installment sales of property. Count two alleged violations of §§ 18 and 32(b) of the Securities Exchange Act of 1934, based on the incorporation in a 10–K report filed by Whittaker with the SEC on January 1, 1972, of the inaccuracies of the registration statement and prospectus complained of in count one. Counts three and four, the precursors of the present complaint, alleged violations of § 10(b) of the '34 Act and Rule 10b–5, and common law fraud and deceit, respectively, based on the same factual allegations.

In the intervening years, the complaint has been subjected to a series of amendments, which have refined both the scope of the action and the constituency of the plaintiff class. First, in March 1976, plaintiffs consented to the dismissal of IIPL as a party plaintiff, and agreed to the entry of summary judgment in favor of the defendants with respect to the first two counts of the complaint. Further winnowing of the action occurred in the wake of the Supreme Court's decision in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976): first, the claims against Anderson were dismissed, followed by plaintiffs' agreement to dismiss the claims against the individual Whittaker defendants and to limit their complaint to the Whittaker earnings misstatements attributable to the Crown inventory discrepancies. The complaint was again amended, this time adding the necessary allegation of "scienter" and expanding the description of the class to include all persons who had purchased Whittaker warrants, as well as common stock, between January 1, 1970 and December 31, 1973.

As the case now stands, the current, or fourth-amended, complaint contains two counts. The first charges that Whittaker between December 22, 1969 (the release date of Whittaker's fiscal 1969 year-end financial statement) and May 11, 1972 (one week following Whittaker's public disclosure of the Crown inventory shortage), made and published in its annual reports and various SEC filings materially false and misleading statements with respect to its financial condition. The second count for common law fraud and deceit relies upon the same factual allegations. The action is now brought on behalf of all persons who purchased Whittaker common stock or warrants between December 22, 1969, and May 11, 1972.

Pursuant to the stipulation of settlement entered into between the parties on December 14, 1977, which provided for the filing of a fourth amended complaint, Whittaker agreed to settle this action for $350,000, less the cost of providing notice to potential class members. The stipulation further provides that from this sum will be deducted an award of attorneys' fees, expenses and disbursements to the plaintiffs, and the costs of administering and distributing the fund.

As set forth in the fourth amended complaint and provisionally certified by the court on December 15, 1977, the class includes all persons (other than Whittaker officers and directors, and those who were officers or employees of Crown or partners or employees of Andersen between January 1, 1969, and May 11, 1972) who purchased Whittaker common stock or warrants expiring May 5, 1979, between December 22, 1969 (the press-release date of Whittaker's fiscal 1969 financial statement) and May 11, 1972 (one week following Whittaker's disclosure of the Crown inventory shortage), inclusive. For purposes of distributing the net proceeds of the proposed settlement fund, the class has been divided into six subclasses, reflecting the

type of security purchased and the period during which purchases were made.[1]

In accordance with the court's orders of December 15, 1977, and February 14, 1978, potential class members were notified individually by mail and by publication of the pendency of this action, the proposed settlement and its terms, their right to be heard with respect to the adequacy of the settlement at a hearing to be conducted for that purpose and to be represented by separately retained counsel, as well as the method for filing proofs of claim or requests for exclusion and the consequences of doing or failing to do so.[2]

A hearing was conducted on March 20, 1978, so that the court might rule on the adequacy of the proposed settlement and determine a proper award of attorneys' fees and disbursements to counsel for the plaintiff class. Over 7,000 proofs of claim have been filed by class members, and some 200 recipients have indicated their desire to opt out of the class, but no poten-

---

**1.** The following chart illustrates the proposed distribution of the settlement fund:

| SUB-CLASS | SECURITY PURCHASED | WHEN PURCHASED | RECOGNIZED LOSS (MAX. PERCENTAGE OF "ACTUAL" LOSS RECOVERABLE | DISTRIBUTIVE SHARE OF FUND TO SUBCLASS |
|---|---|---|---|---|
| I | Common | 12/22/69*–1/13/71 | 5% | 4% |
| II | Common | 1/14/71**–1/10/72 | 15% | 24% |
| III | Common | 1/11/72***–5/11/72**** | 25% | 52% |
| IV | Warrant | 12/22/69*–1/13/71 | 2% | 1% |
| V | Warrant | 1/14/71**–1/10/72 | 6% | 6% |
| VI | Warrant | 1/11/72***–5/11/72**** | 10% | 13% |

\* Press-release date of Whittaker's fiscal 1969 year-end financial statements.

\*\* Press-release date of Whittaker's fiscal 1970 year-end financial statements.

\*\*\* Press-release date of Whittaker's fiscal 1971 year-end financial statements.

\*\*\*\* One week following Whittaker's public announcement of the discovery of the Crown inventory discrepancies.

---

In each case, "Recognized Loss" means the maximum proportion of loss a claimant may recover. It is expressed as a percentage of the amount by which the claimant's purchase price for the security exceeds the greater of the actual sales price or the New York Stock Exchange closing price for that security on May 11, 1972. In the event the aggregate recognized loss for all claimants within a given subclass *exceeds* the distributive share for that subclass, each subclass member's distributive share will be reduced *pro rata*. Should the aggregate recognized loss be *less* than the distributive share allocated to the subclass, the excess will be *pro rata* distributed to those subclasses for which total recognized loss exceeds the distributive share of the fund. Any balance remaining after all claims for recognized loss have been satisfied will be refunded to Whittaker.

**2.** In early January 1978 some 65,000 individual notices were sent by first class mail to all Whittaker shareholders and warrant holders whose names appeared on Whittaker's transfer agents' records. In addition, brokerage firms were notified in December 1977 of the proposed settlement and some 40,000 forms of notice were provided for forwarding to beneficial owners of stock or warrants during the class period. In February 1978 the court approved publication of a supplemental notice in *The Wall Street*

tial class member or representative appeared at the hearing (other than counsel for the named plaintiffs who favor the settlement) or has filed any opposition to the proposed settlement.

The court is now called upon to determine whether the proposed settlement should be approved. See Rule 23(e), F.R. Civ.P. Although the more than 100,000 individual notices and publication notice elicited over 7,000 claims, but not a single objection, the court remains "responsible for the protection of the many class members whose interests are involved but who do not appear in the action." *West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740 (S.D.N.Y.1970), *aff'd*, 440 F.2d 1079 (2 Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). Accordingly, the court will grant its approval only "if the settlement offered is fair, reasonable, and adequate." *West Virginia v. Chas. Pfizer & Co.*, *supra*, 440 F.2d at 1085, quoting from 314 F.Supp. at 740.

■ As the Second Circuit has observed, the most important factor in determining the propriety of a class settlement "is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974) (*Grinnell I*), quoting from *West Virginia v. Chas. Pfizer & Co.*, *supra*, 314 F.Supp. at 740. See *Fricke v. Daylin, Inc.*, 66 F.R.D. 90, 97 (E.D.N.Y.1975). The essential task of the court, therefore, is to form "an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated" and "an educated estimate of the complexity, expenses, and likely duration of such litigation." *Protective Committee v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968), quoted in *West Virginia v. Chas. Pfizer & Co.*, *supra*, 314 F.Supp. at 740–41, 440 F.2d at 1085. On the other hand, the law favors settlements; hence, the court is not required to determine that one party or the other is *entitled* to prevail. Rather, the test involves a weighing of

plaintiffs' likelihood or probability of succeeding on the merits against the benefits of the proposed settlement. See *West Virginia v. Chas. Pfizer & Co.*, *supra*, 440 F.2d at 1085–86; *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567, 571 (5 Cir.1960); *In re Prudence Co., Inc.*, 98 F.2d 559, 560 (2 Cir.1938). See generally *Protective Committee v. Anderson, supra; Grinnell I, supra.*

■ Because the adequacy of a settlement offer turns on an evaluation of plaintiffs' likelihood of success rather than a decision on the merits, a settlement "can be inadequate only in light of the strength of the case presented by plaintiffs." *Grinnell I, supra*, 495 F.2d at 455. Thus, a court will not reject a settlement proposal solely because the amount offered may represent no more than a small fraction of the potential recovery. *Id.* and n. 2.

■ Here, plaintiffs' claims face formidable obstacles. First, it is now settled that in order to prevail on a theory of direct liability under § 10(b) and Rule 10b–5, plaintiffs will have to prove that Whittaker acted with some degree of "scienter" when it misstated its earnings for fiscal years 1969 through 1971. See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2 Cir.1978), reported in [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,275. In this circuit, however, the scienter requirement may be satisfied by a showing of recklessness, at least where the defendant "owes a fiduciary duty to the defrauded party." *Rolf, supra*, at 45.

But even assuming that Whittaker owed such a duty to members of the plaintiff class, and that the proper test of recklessness is the relaxed one of whether defendant "knew or should have known," rather than "knew or must have known," of the facts constituting the fraud, see *Rolf, supra*, at 47 and n. 16; *compare Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7 Cir.1977), *with Stern v. American Banks-*

*hares Corp.,* 429 F.Supp. 818, 827 (E.D. Wis.1977), plaintiffs do not appear likely to carry their burden. Despite the fairly extensive discovery they have thus far conducted (including examination of thousands of Whittaker financial and investigative documents, a review of the transcripts of an SEC investigation, and the deposing of five top-ranking Whittaker officers), plaintiffs have failed to develop any factual basis for resisting Whittaker's contention that it was the innocent victim of a fraudulent scheme carried out by Crown personnel. Indeed, since Whittaker relied throughout on audits conducted by an independent and reputable accounting firm, plaintiffs will be hard pressed to show even negligence on the part of the defendant. Similar problems, of course, infect plaintiffs' claim of common law fraud, which turns on a still more rigorous standard of liability and proof. See *Pittsburgh Coke & Chemical Co. v. Bollo,* 421 F.Supp. 908, 924 (E.D.N.Y.1976), *aff'd,* 560 F.2d 1089 (2 Cir.1977).

Second, plaintiffs' alternative theory that Whittaker is vicariously liable for the conduct of the Crown personnel is highly tenuous. There is good authority that in cases of this kind the so-called "controlling person doctrine" of § 20(a) provides the exclusive basis for derivative liability for violations of the '34 Act. See, *e.g., Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880 (3 Cir.1975); *SEC v. Lum's, Inc.,* 365 F.Supp. 1046 (S.D.N.Y.1973). Thus, even if plaintiffs can show that the Crown personnel acted in violation of the securities laws, Whittaker would be entitled to a good-faith defense under § 20(a). And recent decisions indicate that § 20(a) liability will not ensue unless the controlling persons were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2 Cir.1973) (*en banc*); *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 533 (S.D.N.Y.1977).

*Respondeat superior* would of course supply a stronger predicate for the liability of Whittaker, assuming plaintiffs can show that the conduct of the Crown wrongdoers was violative of § 10(b) or Rule 10b–5. The Second Circuit, however, has yet to decide whether vicarious liability for 10b–5 violations can be predicated on the common law doctrine of *respondeat superior,* see *Rolf, supra,* at 48 and n. 17, and cases cited therein, and even in those circuits which have recognized the availability of the doctrine, it has been applied solely to hold brokerage firms liable for the conduct of their broker-dealers. See *Hollaway v. Howerdd,* 536 F.2d 690 (6 Cir.1976); *Fey v. Walston & Co., Inc.,* 493 F.2d 1036 (7 Cir. 1974). In sum, the weight of authority suggests that plaintiffs' prospects of success on the merits are slim, at best.

If, as the court believes, there is no reasonable likelihood that plaintiffs could prevail summarily on a *respondeat superior* theory, then it is obvious that the critical issue would be one of fact, namely, whether Whittaker's management had the requisite scienter fundamental to the type of claims asserted. Hence, both plaintiffs and defendant would be put to the substantial expense, in terms of time and money, of preparing for and conducting what is likely to be a lengthy and complex trial. Because plaintiffs' case is indeed tenuous, the avoidance of additional expense at this time is not only sensible, but also assures that the class will reap at least some benefit from the efforts expended by plaintiffs to date.

From defendant's perspective, the settlement is also reasonable; the court has no reason, based on the record, to doubt that the amount offered fairly takes into account the substantial legal and other expenses Whittaker would incur in further defending this action, as well as the possibility, however slight, that plaintiffs might ultimately prevail on the merits.

In sum, the serious substantive and factual difficulties apparent in plaintiffs' case support the fairness, reasonableness and adequacy of a settlement based upon the conversion of Whittaker's anticipated legal costs into a fund for the benefit of purchasers of its stock who may have suffered some loss as a result of the events previ-

ously narrated. The proposed amount of $350,000 cannot be considered insubstantial in the circumstances, even though it will have to be reduced by the costs of notice and distribution and an award of attorneys' fees and disbursements to plaintiffs' counsel.[3]

Turning now to the question of attorneys' fees, counsel has applied for an award of $55,000 as a fee and $9,390 as reimbursement for expenses and disbursements, to be paid from the class recovery fund. In support of his application, he has supplied the court with contemporaneous and "reconstructed" records of the time he has devoted to this action. In all, his documentation shows an expenditure of 743.5 hours, 389.5 hours of which are based on contemporaneous entries and 354 hours on "reconstructed" time. The time expended falls in categories of review of the case at the outset, preparation of pleadings, discovery preparation and attendance, legal research and writing, attendance in court, miscellaneous pre-trial matters, settlement discussions, fee application and post-settlement matters.

■ The power of a federal court to award fees to the attorney for a successful class appears nowhere in Rule 23. Rather, as Judge MacMahon has so aptly stated, it "is rooted in the equitable principle that those who are entitled to share in a common fund or benefit, created by litigation instituted and prosecuted by others, should bear a portion of the expenses of the litigation, including counsel fees, by charging the fund." *Barnett v. Pritzker*, 73 F.R.D. 430, 432 (S.D.N.Y.1977). See *Trustees v. Greenough*, 105 U.S. (15 Otto) 527, 536, 26 L.Ed. 1157 (1881); *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2 Cir.1977) (*Grinnell*

*II*), 495 F.2d 448, 469 (2 Cir.1974) (*Grinnell I*); *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 110 (3 Cir.1976) (*en banc*) (*Lindy II*), 487 F.2d 161, 165 (3 Cir.1973) (*Lindy I*). Because the allowance of such fees is "part of the historic equity jurisdiction of the federal courts," *Sprague v. Ticonic National Bank*, 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1938), an attorney's application therefor is directed to the sound discretion of the court, to be exercised not only with an eye to fairly compensating the attorney for services rendered the class, but also "with moderation and a jealous regard to the rights of those who are interested in the fund." *Trustees v. Greenough, supra*, 105 U.S. at 536–37. See *Grinnell II, supra*, 560 F.2d at 1098–99; *Grinnell I, supra*, 495 F.2d at 469–70; *Barnett v. Pritzker, supra*, 73 F.R.D. at 432. See generally Manual for Complex Litigation, Pt. 1, § 1.47 (1977); 7A Wright & Miller, § 1803 (1972 & Supp.1977).

Mounting concern that the class action has come increasingly to be perceived as a device for handsomely rewarding "enterprising" lawyers with "windfall" fees, rather than a method for vindicating the interests of numerous potential plaintiffs, thereby blemishing the integrity not only of the bar, but of the judiciary as well, see *Grinnell I, supra*, 495 F.2d at 469–70; *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 571 (*Eisen II*) (dissenting opinion), has prompted the courts to demand a more faithful adherence to the essential purpose of the equitable fund doctrine. In this Circuit, the *Grinnell* decisions have made emphatically clear that "the touchstone for the fee [is] ... the actual effort made by the attorney to benefit the class," and that "[i]n making its decision, the district court [is] to act 'as a fiduciary who must serve as a

---

3. At the March 20, 1978, hearing, defendant reported it had then expended $43,221.45 in providing potential class members with individual and publication notice, but may have incurred additional notice costs for which it had not yet been billed. Using $50,000 as a highside estimate of the total cost of providing no-

tice to the class, and $30,000 as the estimated cost of administering and distributing the settlement fund, $270,000 will still be available for distribution to the class and for an award of attorneys' fees and disbursements to counsel for plaintiffs.

guardian of the rights of absent class members.'" *Grinnell II,* 560 F.2d at 1099, quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8 Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). It is in light of the Second Circuit's admonition that the purpose of the fee award is to compensate class counsel for the "reasonable value of services benefiting" the class that we now consider the instant application. See *Grinnell II,* 560 F.2d at 1098; *Grinnell I,* 495 F.2d at 470.

Based on the court's own familiarity with the history of this litigation, and the affidavits submitted in support of the proposed settlement and the application for attorney's fees and disbursements, we find the claim for hours devoted to this case generally fair and reasonable and fully consistent with the nature and scope of the action. There are three items, however, which may not properly be charged against the settlement fund.

■ First, plaintiffs' attorney claims a total of 37 hours for the assistance of a paralegal. Paralegals, invaluable though their services may be, are not attorneys, and their time may not be claimed in the guise of an attorney's fee. See *Barnett v. Pritzker, supra,* 73 F.R.D. at 432; *In re Hardwick & Magee Co.,* 355 F.Supp. 58, 73 (E.D.Pa.1973); *Trans World Airlines, Inc. v. Hughes,* 312 F.Supp. 478, 482 (S.D.N.Y. 1970). An attorney is, however, entitled to reimbursement for the wages actually paid paraprofessionals. See *Grinnell I,* 495 F.2d at 473; *Barnett v. Pritzker, supra,* 73 F.R.D. at 432. Accordingly, the 37 hours of paralegal time will be deducted from attorney's time and added to allowable disbursements at the actual rate of pay.

■ Second, petitioner estimates he devoted a total of 45 hours to "[d]iscussions with Court on claims, discussion with claimants, time extension orders, prep[aration] of fee applications." It is now settled, however, that an attorney's efforts in preparing and supporting his fee application, although of unmistakable benefit to the attorney, do not benefit the fund and may not, therefore, be taxed against the class. See *Grinnell II,* 560 F.2d at 1102; *Lindy II,* 540 F.2d at 111. Since petitioner has failed to indicate what portion of the 45 hours was devoted to activities other than preparation of his fee application, the entire 45 hours will be excluded, subject to reconsideration upon presentation of a more precise itemization.

■ Third, we have excluded 10 hours claimed by petitioner for his April 5, 1977, conferences with plaintiffs Lustig and O'Hearn, since we do not believe that mere discussions of the status of the action can be said to have benefited the fund. Accordingly, petitioner's time claim will be reduced from 743.5 to 661.5 hours.

■ In fixing the attorney's fee in this case, we have taken into account the fact that petitioner normally charges an hourly rate of $100 for services performed in non-contingent securities litigation, the size of the recovery, and the fact that although petitioner did reap some benefit from a prior SEC investigation, he could not here rely on any previous judgment or decree and independently pressed this case. See *Grinnell I,* 495 F.2d at 470–74; *Frankenstein v. McCrory Corp.,* 425 F.Supp. 762, 765–67 (S.D.N.Y.1977). We do not believe that a $100 per hour rate should apply in these circumstances, however, where a broad variety of services, of varying difficulty, were all performed by a single attorney. Accordingly, the court has concluded that a rate of $75 per hour would be fair and reasonable based on the court's assessment of petitioner's skill, experience and expertise, the relative complexity of the issues involved, and the prevailing rates of compensation of attorneys of like qualification in this area for services of the kind performed.

■ In addition, petitioner seeks $9,390 in expenses and disbursements, consisting almost entirely of travel and transcript costs. After careful examination of each item, we find the amount sought to be fair and reasonable under the circumstances of this case and that the items claimed are all

properly compensable. As noted above, petitioner is also entitled to reimbursement of 37 hours of paralegal assistance, at an hourly rate of $7.50, for a total of $277.50.

Accordingly, the proposed settlement is approved as fair, reasonable and adequate and plaintiffs' counsel is awarded the sum of $49,312.50 as attorney's fees and $9,667.50 for his expenses and disbursements, payable out of the class recovery fund together with the other expenses of notice and distribution heretofore mentioned. A separate order embodying these directions has been entered this date.

SO ORDERED.